IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| R.W. BECKETT CORPORATION, | ) | CASE NO. 1:19CV00428 |
| | ) | |
| Plaintiff | ) | JUDGE THOMAS M. PARKER |
| | ) | |
| v. | ) | **PLAINTIFF R.W. BECKETT** |
| | ) | **CORPORATION'S MEMORANDUM** |
| FIREMAN'S FUND INSURANCE | ) | **IN OPPOSITION TO DEFENDANT** |
| COMPANY, et al., | ) | **FIREMAN'S FUND INSURANCE** |
| | ) | **COMPANY'S MOTION FOR** |
| Defendants. | ) | **SUMMARY JUDGMENT** |

**I.** **PRELIMINARY STATEMENT.**

Defendant Fireman's Fund Insurance Company ("FFIC") seeks summary judgment against Plaintiff R.W. Beckett Corporation based the arguments that: (1) asbestos claims are barred under its policy due to the presence of a pollution exclusion; (2) Beckett eliminated its right of contribution by entering into a settlement agreement over the CNA policies, thus entitling it to a credit equal to the full limits of the settled policies before it is required to make any further payment; and (3) it is not liable for bad faith as it has not breached its insurance contract with Beckett. However, the authorities cited to by FFIC in support of its arguments are either clearly distinguishable from, or are inapplicable to, the facts involved in this case. As a result, FFIC has failed its burden to establish that it is entitled to summary judgment.

**II.** **STATEMENT OF FACTS.**

Since 1937, Beckett has produced and sold burners for use with residential boilers or furnaces. Between the early 1960's and 1986, flange gaskets purchased by Beckett from third-party manufacturers were sold or supplied by Beckett for use with some of its burners. These flange gaskets were used in the mounting of the burner onto the appliance. In September of 1986,

Beckett discovered that a small amount of chrysotile asbestos was encapsulated in the composition of the flange gasket used in conjunction with its residential burners. Since the time of that discovery, no residential burner produced by Beckett has utilized a flange gasket containing any asbestos. Beckett did not begin producing commercial burners until 1985 and none of those have ever utilized flange gaskets containing any amount of asbestos.[1]

Since approximately 1998, Beckett has been a party to hundreds of lawsuits in at least eight different states by claimants seeking damages for personal injuries alleging exposure to the asbestos containing flange gaskets marketed by Beckett for use with its residential burners (the "Asbestos Claims"). With only a few exceptions, these claims have been advanced by furnace or boiler repairmen claiming to have suffered injury resulting from exposure to the asbestos containing flange gaskets while working on residential appliances in the immediate area of their intended use, typically in the basements of homes.[2]

From 1998 until 2014, Beckett self-funded the defense of the Asbestos Claims under a Claims Service Contract with Continental Insurance Company, a CNA insurance company. Beckett paid $1,927,062.24 out of its own funds for lawyers and experts to defend itself from the Asbestos Claims during the period 1998-2014. Beckett paid $379,250.00 out of its own funds to settle the Asbestos Claims during the period 1998-2014.[3]

In 2014, Beckett found evidence of having been insured by Continental Casualty Company, FFIC, and Defendants ACE Fire Underwriter's Insurance Company and ACE American Insurance Company (the later two jointly referred to as "ACE") during the period 1976-86, which period coincides with the period during which many of the Asbestos Claims filed against Beckett allege

---

[1] Affidavit of Michael C. Smith, ¶¶5-8.
[2] Affidavit of Michael C. Smith, ¶¶10 & 12.
[3] Affidavit of Michael C. Smith, ¶¶18-20.

2

exposure to asbestos containing material in products marketed by Beckett. None of the FFIC or ACE policies contained an asbestos exclusion.[4]

Because CNA was already handling administration of the Asbestos Claims for Beckett prior to 2014 under its Claims Service Contract with Continental Insurance Company, Beckett upon discovering that Continental Casualty Company insured Beckett during the 1976-1980 period, demanded that CNA reimburse Beckett for the defense costs and indemnity paid by Beckett prior to CNA agreeing in 2014 to confirm coverage under the Continental Casualty Company policies. CNA refused and litigation against CNA ensued.[5]

Endorsements dated November 6, 1972 and November 5, 1975 from excess liability coverage written for Beckett by FFIC in the early to mid-1970s reference Buckeye Union Insurance Company ("Buckeye") having provided primary liability insurance coverage for Beckett during two separate coverage terms, the first from December 31, 1970 until December 31, 1973, and the second from December 31, 1973 until December 31, 1976. The endorsements make reference to separate primary limits for bodily injury and property damage, specifically, aggregate bodily injury limits of $300,000.00 for each of the coverage periods, aggregate property damage limits of $50,000.00 for the first coverage term and aggregate property damage limits of $100,000.00 for the second coverage term. The endorsements do not include any information about other terms and conditions including applicable exclusions or endorsements, whether the policies contain choice of law provisions, the amount of premiums paid and whether the policy limits are annualized.[6]

---

[4] Affidavit of Michael C. Smith, ¶21.
[5] Affidavit of Michael C. Smith, ¶22.
[6] Affidavit of Michael C. Smith, ¶14.

Despite a diligent search, Beckett has been unable to locate copies of the Buckeye policies. Beckett likewise lacks any records confirming the payment of premiums for the Buckeye policies.[7]

A records subpoena Beckett served on CNA in this litigation in CNA's capacity as Buckeye's successor failed to uncover either the Buckeye policies or any additional secondary evidence of the Buckeye policies. CNA claims to possess no information from which it is able to confirm that the Buckeye policies were ever issued or from which it is able to deduce the terms and conditions of the Buckeye coverage. Despite Beckett having demanded that CNA confirm issuance of the Buckeye policies, CNA has steadfastly refused to so confirm.[8]

During the period of 2014-2017, the insurance carriers participating in Beckett's defense, namely Continental Casualty Company, FFIC and ACE, entered into an informal cost sharing agreement whereby Continental Casualty Company was responsible for 62.69% of Beckett's defense and indemnity payments, ACE was responsible for 31.09% of Beckett's defense and indemnity payments, and FFIC was responsible for 6.22% of Beckett's defense and indemnity payments. The informal cost share was never reduced to a coverage-in-place agreement, but rather was memorialized by a simple exchange of emails. The initial cost share proposed by Continental Casualty Company, FFIC and ACE before Beckett located secondary evidence of Buckeye's coverage, allocated expense and indemnity shares as follows: ACE 49.5%; CNA 40.5%; and FFIC 10%.[9]

Beckett's records reflect CNA having paid $118,706.35 in indemnity to settle claims from 2014 through the date of Beckett's settlement with CNA in November 2017. Beckett settled its litigation against CNA by way of a buy-back of its insurance coverage not only under the

---

[7] Affidavit of Michael C. Smith, ¶15.
[8] Affidavit of Michael C. Smith, ¶¶16-17.
[9] Affidavit of Michael C. Smith, ¶23.

Continental Casualty Company policies, but also under the Buckeye policies. Under the terms of the settlement, Beckett gave CNA a release of all potential claims against the Continental Casualty Company and Buckeye policies. The release included not just Beckett's claim for reimbursement, but also all future claims for bodily injury and property damage that could ever be tendered under the policies. Beckett's records reflect having made its own payments of $29,678.00 to settle claims since its settlement with CNA, payments which should have been made by ACE and FFIC.[10]

## III. LAW AND ARGUMENT.

### A. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), citing Fed. R. Civ. P. 56(c). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

---

[10] Affidavit of Michael C. Smith, ¶¶24-25 & 27.

### B. THE FFIC POLLUTION EXCLUSION IS AMBIGUOUS IN ITS APPLICATION TO THE ASBESTOS CLAIMS AND THEREFORE DOES NOT BAR COVERAGE.

FFIC argues that the following pollution exclusion set forth in its policy (the "FFIC Pollution Exclusion") precludes coverage for the Asbestos Claims:

> This insurance does not apply:
> (. . .)
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental.

As the insurer, FFIC bears the burden of proving the applicability of the FFIC Pollution Exclusion to the Asbestos Claims. *Continental Ins. Co. v. Louis Marx Co., Inc.,* 64 Ohio St. 2d 399, 401-402, 415 N.E.2d 315 (1980). In an attempt to meet this burden, FFIC cites to the case of *Selm v. American States Ins. Co.*, 5th Dist. No. C-010057, 2001 WL 1103509 (September 21, 2001) for the proposition that friable asbestos falls within the category of an "irritant" or "contaminant" for purposes of insurance policy pollution exclusions. It then goes on to cite numerous cases wherein courts upheld pollution exclusions in insurance policies under a variety of different circumstances. It does all this without ever analyzing the language of the FFIC Pollution Exclusion or the nature of the Asbestos Claims.

Even if asbestos could be considered an "irritant" or "contaminant", which Beckett expressly denies, in order to preclude coverage under the FFIC Pollution Exclusion, FFIC must establish that the Asbestos Claims involve a "discharge, dispersal, release or escape" of asbestos "into or upon land, the atmosphere or any water course or body of water." The Asbestos Claims have been brought by furnace or boiler repairmen alleging to have suffered injury resulting from exposure to the asbestos-containing flange gaskets while working on residential appliances

6

containing Beckett burners. As the Asbestos Claims do not involve any discharge of asbestos into or upon any land, water course or body of water, the question necessarily becomes whether or not the nature of the Asbestos Claims involves the discharge, dispersal, release or escape of asbestos "into the atmosphere."

An examination of this question must be done using general rules of contract interpretation. *St. Marys Foundry v. Employers Ins. of Wausau*. 332 F.3d 989. 992 (6th Cir. 2003). Under Ohio law, nothing but a clear and unambiguous expression in an exception clause, amounting to a necessity for it, will justify a court in holding it utterly inconsistent with the preceding general coverage clauses. *Home Indem. Co. v. Village of Plymouth*, 146 Ohio St. 96, 64 N.E.2d 248 (1945). Phrased another way, an exclusion provision is to be given effect only if its language is specific, clear, and exact. *United States Fidelity & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 80 Ohio St. 3d 584, 586, 1997-Ohio-311, 687 N.E.2d 717 (1997). An insurance contract prepared by the insurer must be construed liberally in favor of the insured and strictly against the insurer if the language used is doubtful, uncertain or ambiguous. *Am. Fin. Corp. v. Fireman's Fund Ins. Co.,* 15 Ohio St. 2d 171, 239 N.E.2d 33 (1968). When an insurance policy includes ambiguous exclusions, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof. *St. Marys.* 332 F.3d at 992, quoting *Moorman v. Prudential Ins. Co. of Am.,* 4 Ohio St. 3d 20, 4 Ohio B. 17, 445 N.E.2d 1122 (1983).

An analysis of the law of Ohio and the 6th Circuit establishes that the language of the FFIC Pollution Exclusion is ambiguous as to whether exposure to the asbestos under the circumstances involved in the Asbestos Claims is a release of an irritant, contaminant or pollution into the atmosphere. In *Owens-Corning Fiberglas Corp. v. Allstate Ins. Co.*, 74 Ohio Misc.2d 144, 660 N.E.2d 746 (Ohio C.P. 1993), the court was called upon to interpret a pollution exclusion with

7

language identical to that employed by the FFIC Pollution Exclusion. The claim sought to be barred by the insurance company involved product liability claims where asbestos was released indoors. The application of the pollution exclusion in that case hinged upon whether asbestos fibers released indoors were released "into the atmosphere." In finding as a matter of law that the release of asbestos fibers within the confines of a building could not be classified as one "into the atmosphere,"[11], the court stated:

> The ordinary, popular meaning of the phrase 'the atmosphere' connotes the external atmosphere which surrounds the earth and consists of the air and any gases or particles therein. The underlying complaints allege property damage that arose from the release of a contaminant or pollutant within the buildings. We do not understand 'the atmosphere' to mean the multiple, diverse environs or surroundings of individual buildings.
>
> When the clause 'into or upon land, the atmosphere or any water course or body of water' is read as a whole, as it must be, it is readily apparent that the pollution exclusion applies to property damage arising from the discharge of pollution into the external environment or onto some part thereof, rather than the release of asbestos fibers within a building.

*Id.* at 155-156, citing *United States Fid. & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 79-80, 578 N.E.2d 926. The court went on to state that:

> [T]he word 'atmosphere' must be given its ordinary meaning and must be interpreted in conjunction with the other words used in the exclusion. It appears that the pollution exclusion was intended to address environmental pollution, that is the pollution or contamination of the external environment.

*Id.* at 156, citing *Flintkote Co. v. A. Mut. Liab. Ins. Co.*, (Oct. 14, 1992), Cal.Super. No. 808-594, unreported.

---

[11] The court in *Owens Corning* also expressly held that asbestos cannot be categorized as an "irritant," "contaminant," or "pollutant," as a matter of law, within the meaning of the exclusion. *Owens-Corning*, 74 Ohio Misc. 2d at 152. In doing so, it expressly rejected the insurer's citation to case law which classified asbestos as a pollutant based upon the fact that it is considered a hazardous substance under the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as opposed to such a finding made in the context of an insurance policy's pollution exclusion. This rejected CERCLA argument was relied upon by the court in *Selm* in finding that asbestos was a pollutant for purposes of the pollution exclusion involved in that case.

Likewise, in *Lumbermans Mut. Casualty Co., S-W Indus.*, 39 F.3d 1324 (6th Cir.1994), the 6th Circuit addressed the same issue in a case also involving a pollution exclusion identical to the FFIC Pollution Exclusion. In rejecting the application of the pollution exclusion, the court stated:

> The fumes and dust that injured Viock, it is undisputed, were confined inside S-W's plant and, in fact, were confined to that portion of that plant involved in the gluing process in which Viock worked. It strains the plain meaning, and obvious intent, of the language to suggest that these fumes, as they went from the container to Viock's lungs, had somehow been "discharged, dispersed, released or escaped." Or, considering that the fumes were confined to Viock's work area, that they had been discharged into the "atmosphere," as that word is ordinarily understood. *See Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 609 N.E.2d 506, 593 N.Y.S.2d 966 (N.Y. 1993) (pollution exception not applicable to injuries from exposure to asbestos in confined area rather than "atmosphere"). Without belaboring the obvious, we hold that this exclusion is intended to shield the insurer from the liabilities of the insured to outsiders, either neighboring landowners or governmental entities enforcing environmental laws, rather than injuries caused by toxic substances that are still confined within the area of their intended use.

*Id.*, 39 F.3d at 1326.

Beckett recognizes that the court in *Selm* applied the pollution exclusion in that case to deny coverage for injuries sustained when the removal of flooring caused a spread of asbestos within a residence. However, the facts involved in *Selm* are distinguishable from this matter in that the pollution exclusion at issue in that case contained language much different than the language employed by the FFIC Pollution Exclusion. The *Selm* pollution exclusion *did not exclude injuries caused by the discharge, dispersal, release or escape of asbestos "into or upon land, the atmosphere or any water course or body of water"* as was the case on *Owens Corning*, *Lumbermens* and in the instant matter.[12] Rather, the pertinent language of that pollution exclusion

---

[12] The FFIC Pollution Exclusion contains qualified language that was added by the insurance industry to the standard commercial general liability forms in 1973 to address large-scale environmental clean-up situations. 1 LNPG Ohio Insurance Litigation, § 4.03 [1][a]. Thereafter, in 1985, the insurance industry once-again modified the standard pollution exclusion to expand its coverage to include all pollution claims regardless of the cause of the pollution exposure. 1 LNPG Ohio Insurance Litigation, § 4.03 [1][c]. This expanded version of the pollution exclusion was the type involved in the *Selm* case. 2 Law of Liability Insurance § 14.09[2], citing *State Auto Mutual Ins. Co. v. Flexdar, Inc.*, 937 N.E.2d 1203 (Ind. App. 2010).

9

excluded injuries resulting in the release of pollutants, "which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured." The Asbestos Claims do not involve any such fact scenario.[13]

Other courts have determined that pollution exclusions are ambiguous, and thus unenforceable, as to whether they covered injuries caused by pollutants released in the immediate area of their intended use. See, *Bosserman Aviation Equip. Inc. v. United States Liab. Ins. Co.*, 183 Ohio App.3d 29, 2009-Ohio-2565, ¶20 (applying *Lumberman's Mut. Casualty Co.* to hold that pollution exclusion did not apply to an exposure to toxic chemicals confined within an employee's work area); *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181-1183 (6th Cir. 1999) (applying Michigan law to hold that pollution exclusion did not bar coverage of claim of employee injured by chemical fumes where the injury occurred only a few feet from where the chemicals were being used).

Furthermore, a finding of ambiguity as to the FFIC Pollution Exclusion in its application to the Asbestos Claims is supported by the historical purpose for which pollution exclusions were created. In *Anderson v. Highland House Co.*, 93 Ohio St.3d 547, 2001-Ohio-1607, 757 N.E.2d 329, the Ohio Supreme Court held that the release of carbon monoxide from a residential heater located in an apartment building could not be a "pollutant" under a pollution exclusion of an insurance policy because the parties had not specifically defined carbon monoxide as a pollutant. *Id.* at syllabus. The Supreme Court noted that the history and purpose of pollution exclusions were to protect insurers against claims for "'gradual environmental degradation of any type and to preclude coverage responsibility for government-mandated cleanups.'" *Id.* at 550, quoting

---

[13] It should also be noted that the pollution exclusion present in the case of *Whitt Mach., Inc. v. Essex Ins. Co.*, 377 Fed.Appx. 492 (2010), also did not involve the qualified pollution exclusion present in this case. Rather, its language was much broader without the qualification of the release being made "into the atmosphere."

10

Stempel, *Reason and Pollution: Correctly Construing the "Absolute" Exclusion in Context and in Accord With Its Purpose and Party Expectations*, 34 Tort & Ins.L.J. 1, 5 (1998). Because the carbon monoxide claim in *Andersen* involved a residential setting — an atypical setting for pollution claims involving environmental degradation — the Supreme Court found that an insured would have to "guess" on whether it was excluded. Construing the ambiguity against the insurer, the Supreme Court held that "carbon monoxide emitted from a malfunctioning residential heater is not a pollutant under the pollution exclusion of a comprehensive general liability policy unless specifically enumerated as such." *Id.* at 552.

The nature of the Asbestos Claims does not rise to the level of large-scale environmental pollution for which this type of exclusion was intended. As it was in the case of *Anderson*, the asbestos exposure involved in the Asbestos Claims was limited in scope to residential settings in the immediate area of the intended use of Beckett's product.

Beckett acknowledges that the case of *Graftech Int'l, Ltd. v. Pac. Emplrs. Ins. Co.*, Eighth Dist. No. 105258, 2017-Ohio-9271, cited by FFIC in its brief, refused to apply the purpose and intent reasoning in *Anderson* in upholding the application of the pollution exclusion involved in that case. It also rejected the argument that a localized release of substances in one part of an aluminum manufacturing plant is insufficient to constitute a fouling of the environment under the policy because some of the substances may have traveled only a few feet. However, the *Graftech* court did not reject the *Anderson* reasoning itself, but merely distinguished the facts of the *Anderson* case from those involved in its case. It recognized that the facts involved in the *Graftech* case showed "a large-scale industrial setting" which was "vastly different from the residential setting in *Anderson*." Furthermore, *Graftech* only rejected the localized exposure argument due to the specific language contained with the pollution exclusion involved in that case. That

11

pollution exclusion expressly defined the word "environment" to mean, among other things, "the air inside a structure." No such language appears in the FFIC Pollution Exclusion.

Lastly, in reviewing the factual setting of this case, it should be inferred that the FFIC Policy was not intended by the parties to exclude claims of the type of the Asbestos Claims. Specifically, FFIC's own conduct should be taken into consideration. Ohio law is clear that where the language of a contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation. *Westgate Ford Truck Sales v. Ford Motor Co.*, 8th Dist. Nos. 10173 and 101136, 2014-Ohio-5429, ¶19. In this regard, a course of dealing between parties can be used to explain or supplement a written contract. *Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*, 11th Dist. No. 2017-L-142, 2018-Ohio-5326, ¶47. In determining whether or not the FFIC Pollution Exclusion applies to the Asbestos Claims, it should be recognized that FFIC has been paying out sums for the defense and indemnification of Beckett against the Asbestos Claims *since 2014* without ever asserting the language of the FFIC Pollution Exclusion as a bar to coverage. Such conduct should be construed by the Court as FFIC's implicit recognition of the fact that the language of the FFIC Pollution Exclusion does not bar coverage for those claims.

Furthermore, had the parties intended asbestos to be precluded from coverage under the FFIC Policy, they would have done so with the insertion of an express asbestos exclusion. Express asbestos exclusions have been commonly used in the insurance industry for years. *Owens-Corning*, 74 Ohio Misc2d at 157. The absence of such an express exclusion and the requirement to construe the FFIC Pollution Exclusion in Beckett's favor leads to the conclusion that the FFIC Pollution Exclusions cannot be applied to the Asbestos Claims to preclude coverage.

FFIC has failed its burden of proving the applicability of the FFIC Pollution Exclusion to the Asbestos Claims. Accordingly, summary judgment on this issue must be denied.

### C. BECKETT DID NOT DEFEAT FFIC'S RIGHT OF CONTRIBUTION FROM CNA AS NO SUCH RIGHT EXISTED.

FFIC complains that Beckett has defeated its right of contribution, specifically, that as a result of Beckett's settlement with CNA[14], FFIC is no longer able to seek equitable contribution in cases where FFIC might be called upon to pay indemnity for periods of time when CNA was on the risk. Contrary to FFIC's claim, no such right exists following Beckett's settlement with CNA pursuant to the case of *OneBeacon American Insurance Company v. American Motorists Insurance Company*, 679 F.3d 456 (6th Cir. 2012), wherein the court held that buy-backs which serve to exhaust the policy of a settling insurer have the effect of precluding non-settling insurers from seeking equitable contribution. *Id*. at 463. *One Beacon* stands for the proposition that a settled policy is deemed exhausted for purposes of equitable contribution under Ohio law. *Id*. at 464. FFIC has cited no case law in its Brief calling *One Beacon* into question, and FFIC's decision not to implead CNA as a third party defendant suggests it understands *One Beacon* serves as an absolute bar to any contribution claims by FFIC.

### D. FFIC IS NOT ENTITLED TO ANY SETTLEMENT CREDIT AS A RESULT OF THE CNA SETTLEMENT.

Knowing that it no longer has contribution rights, FFIC instead argues that it is entitled to a settlement credit in the full amount of Beckett's settlement with CNA, citing several 6th Circuit cases which FFIC maintains support its claim. The 6th Circuit cases cited by FFIC are not controlling factually or because the cited holdings are dicta. In *GenCorp, Inc. v. AIU Ins. Co*., 297

---

[14] "CNA" as used herein includes policies of primary liability insurance issued to Beckett by Buckeye spanning two three-year coverage terms, 12/31/1970-12/31/1973 and 12/31/1973-12/31/1976, and policies of primary liability insurance issued to Beckett by Continental Casualty Company spanning the coverage terms of 12/31/1976-12/31/1978, 12/31/1978-12/31/1979 and 12/31/1979-1/31/1980.

13

F. Supp. 2d 995 (N.D. Ohio 2003), the court ruled that contribution claims were barred (as maintained by Beckett here), the court reserving the issue of any set-off.  In *Bondex Int'l v. Hartford Accident & Indem. Co.*, No. 1:03-CV-01322, 2006 U.S. Dist. LEXIS 11606 (N.D. Ohio Mar. 20, 2006), the issues that were part of the court's holding included whether a product liability cap applied and whether plaintiffs qualified as named insureds, not whether contribution claims were barred or whether the non-settling carrier was entitled to any set-off.  In *IMG Worldwide, Inc. v. Westchester Fire Ins. Co.*, No. 1:11 CV 1594, 2015 U.S. Dist. LEXIS 114659 (N.D. Ohio Aug 28, 2015), settlement credits were ultimately not allowed under the 6th Circuit's remand Order. And in *Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F. Sup 2d 483 (N.D. Ohio 2006), the court approved of an insured's right to exhaust a policy by way of a settlement with its insurer for less than policy limits, offering no comment on the issue of settlement credits.

The case of *Goodrich Corporation v. Commercial Union Fire Insurance Company*, 2008-Ohio-3200, offers more pointed guidance to courts applying Ohio law when faced with deciding whether settlement credits are warranted in any given case.  The court in *Goodrich* begins its analysis by noting the dearth of appellate law in Ohio on the issue of settlement credits, specifically, guidance on the circumstances under which a non-settling insurer might be entitled to settlement credits, and if so, how principles of equity and public policy should factor into that determination.  *Id*. at ¶37.  What little guidance is available on the issue of when settlement credits might be permitted is limited to the court's comment that settlement credits should not be permitted in those instances where there is no potential for a double recovery:

> Setoff of settlement funds has been recognized as a means to protect against the danger of a double recovery…[T]he basis for granting a defendant credit for the settlement money that the plaintiff has received from other defendants is the notion that a plaintiff should not receive more than one recovery for the same damages…Application of a settlement credit assumes that the

14

> compensation paid by each defendant is for the same damages. Where no potential for double recovery by the plaintiff has been demonstrated, however, setoff should not be permitted.

*Id. at* ¶38.

The *Goodrich* court concludes by noting as a matter of procedure, that because the entitlement to a settlement credit is in the nature of an affirmative defense, the party seeking to take advantage of a settlement credit bears the burden of proving the amount of the credit. *Id*. at ¶39.

The facts of *Goodrich* aid in understanding the court's holding. In *Goodrich*, the policyholder settled with certain liability insurers arising out of soil and groundwater remediation claims at one of the insured's production facilities. *Id*. at ¶¶1-5, inclusive. In holding that non-settling insurers were not entitled to settlement credits under the facts of the case, the court remarked that the record was devoid of any evidence indicating payments from settling insurers were intended solely to compensate the insured for response costs, which costs were the subject of the litigated dispute that gave rise to the settlements. *Id*. at ¶42. Instead, the settlement agreements in *Goodrich* indicated that the insurers paid for releases from their policyholder covering a much wider array of claims, the releases also containing provisions absolving the carriers from liability for future unknown personal injury and property damage claims. *Id*. In short, the court decided that the universe of claims resolved by the settling insurers was not coextensive with the claims involved in the underlying litigation, thereby precluding an entitlement to settlement credits.

Here, as in *Goodrich*, Beckett's settlement with CNA does not by its terms qualify as a double recovery that would warrant imposing settlement credits. The Settlement Agreement between Beckett and CNA is not limited to pending asbestos claims that would only have triggered coverage under the bodily injury coverage part of the Continental Casualty Company policies, and

also presumably under the Buckeye policies.[15] The Settlement Agreement also includes a release from potential future occurrence-based property damage claims under the policies' separate property damage coverage parts that carry separate policy limits. Because Beckett settled with CNA in exchange for a release that encompasses all potential future claims regardless of which coverage parts might be implicated, the settlement proceeds received are not under the terms of the Settlement Agreement coextensive with the bodily injury asbestos claims for which FFIC seeks a credit. A settlement credit is not supportable under these circumstances. Parenthetically, even if the court were to determine that a credit is warranted here, because the record currently before the court is devoid of any uncontested evidence to provide the court with guidance on how such a credit should be allocated among coverage parts, FFIC has failed to meet its burden under Fed. R. Civ. P. 56 making the court unable as a matter of law to enter the judgment requested by FFIC.

Beckett's settlement with CNA does not rise to the level of a double recovery for a more compelling reason, however. Here, the settlement objected to by FFIC was meant to resolve a litigated claim by Beckett against Continental Casualty Company for indemnity payments and defense costs previously paid directly by Beckett in connection with its hundreds of bodily injury asbestos claims, monies that Beckett claimed in its underlying litigation should have been paid by Continental Casualty Company. There can be no double recovery with respect to CNA's settlement proceeds not only because the settlement included a release that extended to other coverage parts, but also because CNA's payment arose out of a claim for reimbursement of past indemnity and defense costs paid directly by Beckett. Beckett's claim in the underlying litigation

---

[15] Beckett maintains the Buckeye policies were issued. Beckett's position is based in part upon secondary evidence of coverage, namely, endorsements made a part of FFIC's excess coverage for the same time period (1970-1976) making reference to Buckeye having issued primary coverage in certain amounts. Beckett's position is further based upon CNA having included the Buckeye coverage block in an informal allocation that previously governed the payments of defense and indemnity among CNA, FFIC and ACE. CNA has never confirmed that the Buckeye policies were ever issued, and a recent records subpoena addressed to CNA failed to uncover the Buckeye policies or any secondary evidence thereof.

did not seek payments in anticipation of future claims. The litigation involved only a claim for reimbursement. Hence the monies are not coextensive, most especially with respect to the indemnity portion of the reimbursement which undeniably has the effect of eroding limits that FFIC claims should be part of a credit.

Even if the court concludes FFIC is entitled to a settlement credit on principle, any such entitlement being specifically denied by Beckett, such a judgment cannot presently be entered as a matter of law under facts of record that remain in dispute. FFIC seeks a credit equal to the "full limit of the settled policies". FFIC's Motion and its supporting documentation do not conclusively establish what is meant by the "full limit of the settled policies", the Affidavit presented by Beckett in opposition to FFIC's Motion suggesting that reasonable minds differ over the meaning of what is meant by qualifying limits. Under *Goodrich*, FFIC has the burden of proving the amount of any credit that might be imposed, including the "full limit of the settled policies", and FFIC in its Motion points to no undisputed evidence of record to meet that burden. FFIC's burden here consists of the following:

- FFIC must establish the terms and conditions of the unavailable Buckeye policies, which policies CNA has never conceded to having issued,[16] including the limits of those policies, any applicable exclusions or endorsements, whether the policies contain choice of law provisions, whether premiums were paid for

---

[16] FFIC's Motion assumes that the Buckeye policies are a part of the CNA coverage block that Beckett should inherit. The terms of the Buckeye policies being unknown calling that coverage into question, FFIC's Motion fails to account for the effect failure to confirm Buckeye coverage would have on the CNA coverage block, as removing six out of ten years of coverage would make it necessary to modify the percentage share of responsibility of the parties, increasing FFIC's share from 6.22% to 10%, increasing ACE's share from 31.09% to 49.5%, and decreasing CNA's share from 62.69% to 40.5%.

17

the coverage, and whether the policy limits under each of the two Buckeye three-year coverage terms are annualized[17]. FFIC has not met this burden.

- FFIC must also offer proof of the un-eroded limits of the Continental Casualty Company and Buckeye policies after deducting from the limits of those policies the amount of indemnity already paid to settle claims. FFIC has not met this burden.

- Beckett having offered evidence of payments made by CNA and payments Beckett made itself to settle asbestos claims, the sum total of which exceed the limits of certain Buckeye and/or Continental policies so as to exhaust those policies, FFIC must explain why such evidence does not raise an issue of fact precluding the entry of summary judgment[18]. FFIC has not met this burden.

- FFIC must provide the Court with a road map of how indemnity paid to settle individual asbestos claims in the past should be allocated across the settled policies in order to determine how the settlement credit it seeks should be applied. FFIC has not met this burden.

Given all of the foregoing reasons which point to FFIC not being entitled to judgment as a matter of law on its settlement credit defense, FFIC's Motion must be dismissed.

---

[17] The FFIC endorsement that makes reference to the Buckeye policies includes reported amounts of liability coverage for bodily injury, property damage and products, but is silent on the issue of whether those limits are annualized or represent the entirety of the coverage for each three year coverage term.

[18] Beckett's records reflect having paid $379,250.00 to settle asbestos claims prior to Continental confirming coverage in 2014, payments that should have been made by Continental and were reimbursed to Beckett as part of its settlement with CNA. Beckett's records also reflect CNA having paid $118,706.35 in indemnity to settle claims from 2014 through the date of its settlement in November 2017. Beckett's records further reflect its own payments of $29,678.00 to settle claims since its settlement with CNA, payments which should have been paid by ACE and FFIC. The Motion of FFIC fails to address how these payments should be allocated to address the issue of exhaustion, the total amount of those indemnity payments exceeding the limits of some periods of Buckeye and/or Continental coverage. The extent to which exhaustion of certain primary policies is recognized will have the effect of increasing the allocated share of ACE and FFIC.

### E.  FFIC IS NOT ENTITLED TO SUMMARY JUDGMENT ON BECKETT'S CLAIM FOR BAD FAITH.

FFIC in its Motion attempts to classify Beckett's bad faith claim as arising out of FFIC's failure to re-allocate only. While a finding of bad faith in this context presupposes coverage, and hence FFIC failing to prevail on its attempt to dismiss Beckett's claim on exclusionary grounds, whether FFIC had reasonable justification under controlling case law not to reallocate is dependent upon resolution of disputed factual findings that necessarily preclude the entry of summary judgment on this issue, specifically what constitutes the full limits of the settled policies, an issue that remains in contention.

FFIC does not, however, even begin to address Beckett's claim that FFIC also unilaterally and without the benefit of any court order, ceased paying for any defense of the Asbestos Claims. Specifically, Beckett alleges in its Complaint that FFIC stopped paying for any of Beckett's defense expenditures in connection with the Asbestos Claims after Beckett's settlement with CNA, forcing Beckett to pay those expenditures itself.[19] FFIC made no effort to advise its insured of this unilateral coverage determination, a determination Beckett understands was reversed at some point after Beckett filed suit, as at some point FFIC resumed payment of defense expenditures. FFIC having denied this allegation in its claim, and having provided no undisputed facts as part of its Motion that would allow the court to resolve this issue in FFIC's favor as a matter of law, the court is not presently in a position to enter judgment on FFIC's Motion seeking a summary disposition of Beckett's bad faith claim.

---

[19] Affidavit of Michael C. Smith, ¶26.

## IV. CONCLUSION.

The FFIC Pollution Exclusion does not bar coverage for the Asbestos Claims as the specific language it contains is ambiguous as to whether or not it applies to those claims. FFIC is not entitled to any settlement credit as Beckett's settlement with CNA does not rise to the level of a double recovery. Even if FFIC was entitled to a settlement credit, which it is not, FFIC has failed its burden to establish facts germane to the Buckeye Policies and the allocation of past indemnity paid to settle individual asbestos claims, all of which is essential to calculate such a settlement credit. Accordingly, FFIC is not entitled to summary judgment.

Respectfully submitted

*/s/ David R. Beane*
David R. Beane, Esq. (PA Bar Reg. #53343)
BEANE, LLC
606 North Fifth Street, Suite 7
Post Office Box 1339
Reading, Pennsylvania 19603
Telephone: (610) 378-5555
Fax: (610) 378-5551
E-Mail: drb@beanellc.com

*/s/ Howard T. Lane*
Howard T. Lane, Esq. (OH Bar Reg. #0062251)
FAUVER CO., LPA
409 East Avenue, Suite A
Elyria, Ohio 44035
Telephone: (440) 934-3700
Fax: (440) 934-3708
E-Mail: hlane@fauverlegal.com
Attorneys for Plaintiff R.W. Beckett Corporation

## CERTIFICATION OF TRACK ASSIGNMENT

This case is assigned to the Standard Track and complies with its page limitation.

*/s/ Howard T. Lane*
Howard T. Lane, Esq. (OH Bar Reg. #0062251)
Attorney for Plaintiff R.W. Beckett Corporation

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed via the Court's ECF system on December 18, 2019, the parties to be notified via the Court's Electronic Filing System.

*/s/ Howard T. Lane*
Howard T. Lane, Esq. (OH Bar Reg. #0062251)
Attorney for Plaintiff R.W. Beckett Corporation