IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| R.W. BECKETT CORP., | ) | Case No. 1:19-CV-428 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| ALLIANZ GLOBAL CORP. | ) | |
| & SPEC. SE, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Plaintiff, R.W. Beckett Corporation ("Beckett") was a defendant in numerous cases alleging harm from exposure to asbestos in gaskets that Beckett had used in oil burners that it produced between 1960 and 1986.  From 1998 through 2014, Beckett funded its own litigation through a claims service contract with Continental Insurance Company, a CNA Financial ("CNA") affiliated company.  Beckett later discovered that it had several insurance policies (including several CNA-affiliated policies) that covered the period during which the asbestos claims accrued.  The insurance companies entered into an informal cost sharing agreement.  But the arrangement ended when Beckett settled its claims against the CNA-affiliated insurers and asked its remaining insurers – Fireman's Fund Insurance Company ("FFIC"), ACE Fire Underwriters Insurance, and ACE American Insurance Company (latter two jointly referred to as "ACE") – to assume 100% of the liability for the asbestos litigation.  According to Beckett, FFIC and ACE then stopped paying altogether.

Beckett sued FFIC and ACE.[1]  Beckett's complaint alleged claims for: (1) breach of contract; (2) a declaratory judgment that FFIC and ACE's refusal to reallocate liability was unreasonable, in bad faith, and a violation of the underlying insurance policies; and (3) bad faith. ECF Doc. 1 at 9-11.  FFIC now seeks summary judgment on three grounds.  ECF Doc. 29.  First, FFIC argues that its policy included an exception to coverage for asbestos exposure liability. ECF Doc. 29 at 5-9.  Second, FFIC asserts that it is entitled to a settlement credit or contribution equal to the limits of the settled policies.  ECF Doc. 29 at 9-15.  And, finally, FFIC contends that Beckett's bad faith claim is meritless because FFIC's position regarding Beckett's coverage was reasonably justified.  ECF Doc. 29 at 15-16.  Beckett filed an opposition brief, FFIC replied, and Beckett filed a sur-reply.  ECF Doc. 34; ECF Doc. 36; ECF Doc. 40.

Shortly after briefing was completed, FFIC filed a "motion to certify questions to the Ohio Supreme Court."  ECF Doc. 41.  Specifically, FFIC sought to certify two questions to the Ohio Supreme Court pursuant Ohio S. Ct. Prac. R. 9.01(A):

1. Does a pollution exclusion that applies to bodily injury "arising out of the discharge, dispersal, release or escape of . . . toxic chemicals . . . or other irritants, contaminants or pollutants into . . . the atmosphere" preclude coverage for claims against the insured alleging damages because of bodily injury from the claimant's inhalation of asbestos emanating from the insured's product?

2. Where several liability insurers are jointly responsible for progressive injury claims such that each would be entitled to contribution from the other if any

---

[1] Beckett's complaint named as defendants: (1) Allianz Global Corporate & Specialty ("Allianz"), as successor to an FFIC policy held between 1980 and 1981; (2) ACE Fire Underwriters Insurance Company, as successor to a Aetna Fire Underwriters Insurance Company policy that Beckett held between 1981 and 1984; and (3) Century Indemnity Company, as successor to an INA Insurance Company of Ohio ("INA") policy held between 1984 and 1986.  ECF Doc. 1.  However, it was later discovered that Allianz was not a successor to the FFIC policy, and that ACE American Insurance Company was the proper successor to the INA policy.  Thus, FFIC and ACE were substituted for Allianz and Century Indemnity Company.  ECF Doc. 7; ECF Doc. 11.  CNA is the parent company to Continental Casualty Company, which insured Beckett between 1978 and 1980 insurers and is the successor to Beckett's Buckeye Union Insurance Company policies held between 1970 and 1976.  ECF Doc. 1 at 4 & n.5.

one insurer paid more than its fair share, if the insured settles with and releases one of the insurers, are the remaining, non-settling insurers entitled to credit for the amounts that the settling insurer would have paid but for the settlement?

ECF Doc. 41.  Beckett opposes FFIC's motion to certify because "there exists sufficient guidance from available research materials already at hand to permit this court to properly examine the questions presented by FFIC's Motion for Summary Judgment." ECF Doc. 43 at 1. FFIC filed a reply in support of its motion to certify, and the matter is now fully briefed. ECF Doc. 44.

Because FFIC has not shown that certification of either question presented in its motion to certify is necessary the court declines to exercise its discretion to certify question to the Ohio Supreme Court, and FFIC's motion to certify questions to the Ohio Court of Appeals (ECF Doc. 41) will be DENIED.  Further, because FFIC has not shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on any of the issues raised in its motion for summary judgment, FFIC's motion for summary judgment (ECF Doc. 29) must be DENIED.

## I.     Facts

The following facts are undisputed or established by the Rule 56 evidence.

### A.     The Asbestos Litigation and CNA Settlement

Beckett is a producer of burners for use in residential boilers and furnaces.  ECF Doc. 34-1 at 2. From the early 1960s until September 1986, Beckett used flange gaskets that it purchased from a third-party manufacturer in some of its burners. ECF Doc. 34-1 at 2, 8.  In September 1986, Beckett learned that some of the flange gaskets it had used contained a small amount of encapsulated chrysotile asbestos and ceased using them in its burners. ECF Doc. 34-1 at 2. Since 1998, Beckett was subject to "hundreds of lawsuits in at least eight different states," each

with plaintiffs seeking damages for injuries related to exposure to the asbestos-containing flange gaskets.  ECF Doc. 34-1 at 2-3; *see also* ECF Doc. 29 at 3 (citing ECF Doc. 1 at 6 (¶19)).  Much of the alleged exposure in those cases occurred between 1976 and 1986.  ECF Doc. 34-1 at 4.  From 1998 through 2014, Beckett self-funded the litigation under a Claims Service Contract with Continental Insurance Company and paid $1,927.062.24 for its defense costs and $379,250 in settlements.  ECF Doc. 34-1 at 4.

In 2014, Beckett discovered that it had numerous insurance policies[2] between 1970 and 1986, under which CNA, FFIC, and ACE were primary carriers.  ECF Doc. 34-1 at 4; *see also* ECF Doc. 1 at 4-5 (¶¶ 9-16); ECF Doc. 29 at 3-4.  From 2014 through 2017, CNA, FFIC, and ACE, through an exchange of e-mails, agreed to an informal cost sharing agreement on a pro-rata, time-on-risk basis.  ECF Doc. 34-1 at 5; *see also* ECF Doc. 1 at 6-7 (¶¶20-26); ECF Doc. 29 at 4.  The agreement was never reduced to a formal coverage-in-place agreement.  ECF Doc. 34-1 at 5.  Under the agreement, Continental was responsible for 62.69% of Becket's defense and indemnity payments.  ECF Doc. 34-1 at 5.  ACE was responsible for 31.09%.  ECF Doc. 34-1 at 5.  And FFIC was responsible for 6.22%.  ECF Doc. 34-1 at 5; *see also* ECF Doc. 29 at 2 & n.1, 4.

In March 2017, Beckett sued Continental and CNA in the Ohio Court of Common Pleas to seek reimbursement of the $2,306,312.24 in defense and settlement costs that Beckett had paid between 1998 and 2014.  Defendants removed the case to this court.  *See* CM/ECF for N.D. Ohio Case No. 1:17-cv-856, Doc. 1-1.

In November 2017, Beckett and CNA agreed to a settlement in Case No. 1:17-cv-856.  ECF Doc. 34-1 at 5.  The settlement was by way of a buy-back of the insurance coverage under

---

[2] The policies are discussed in greater detail in Section II.B., *infra*.

4

both the Continental Casualty Company policies and the Buckeye policies.  ECF Doc. 34-1 at 5;
*see also* ECF Doc. 29 at 4 ("CNA paid Beckett a substantial sum as part of the settlement."
(*citing* ECF Doc. 31)).  Beckett released CNA of all potential claims for reimbursement, bodily
injury, and property damages that could have been brought under those policies.  ECF Doc. 34-1
at 5.  Beckett did not give notice to or receive consent from the other insurance companies before
entering the settlement agreement with CNA.  ECF Doc. 29 at 4.[3]  CNA had paid $118,706.35 in
indemnity to settle claims from 2014 through the date of the settlement.  ECF Doc. 34-1 at 5.

     After the CNA settlement, Beckett told FFIC and ACE that the CNA policies were
"exhausted" and "instructed the Non-Settling Insurers to reallocate their respective percentage
shares of R.W. Beckett's defense and indemnity obligation for the Asbestos Claims, to reflect
that the Non-Settling Insurers [were] responsible for funding 100% of R.W. Beckett's defense
and indemnity obligation for the Asbestos Claims."  ECF Doc. 1 at 7-8 (¶29).  Instead, FFIC
stopped paying Beckett for any defense expenditures.  ECF Doc. 34-1 at 5.  FFIC did not advise
Beckett of its decision to stop paying.  ECF Doc. 34-1 at 5.  As a result, Beckett was forced to
cover its own defense costs, which included a total of $29,678.00[4] in settlement payments made
after the CNA settlement.  ECF Doc. 34-1 at 5-6.

---

[3] FFIC does not cite any evidence for this assertion, but Beckett does not contest this fact in its response
brief.  *See generally* ECF Doc. 34.
[4] Beckett's complaint says that it "incurred $136,839.15 in defense costs on account of the Non-Settling
Insurers' refusal to reallocate their now 100% share of R.W. Beckett's defense costs for the Asbestos
Claims under the FFIC policy, the Aetna Policy, and the INA policy, which amount continues to accrue."
ECF Doc. 1 at 8 (¶34).  And that it "paid $13,062.50 to fully fund settlements agreed to by the Non-
Settling Insurers on account of Allianz's refusal to pay its proper allocated share of indemnity to settle
Asbestos Claims under the FFIC policy, which amount continues to accrue."  ECF Doc. 1 at 9 (¶36).

**B.** **Beckett's Insurance Policies**

Beckett's insurance policies between 1970 and 1986 included the following:

| | **Beckett's Insurance Policies** | | |
|---|---|---|---|
| **Start Date** | **End Date** | **Policy No.** | **Issuing Company** |
| Dec. 31, 1970 | Dec. 31, 1973 | CBP-3693 | Buckeye Union Insurance Co. |
| Dec. 31, 1973 | Dec. 31, 1976 | CBP-6596 | Buckeye Union Insurance Co. |
| Dec. 31, 1976 | Dec. 31, 1978 | 306-41-47 | Continental Casualty Co. |
| Dec. 31, 1978 | Dec. 31, 1979 | 392-20-07 | Continental Casualty Co. |
| Dec. 31, 1979 | Jan. 1, 1980 | 005-30-83-26 | Continental Casualty Co. |
| Feb. 1, 1980 | Feb. 1, 1981 | MXP-358-05-16 | Fireman's Fund Insurance Co. |
| Feb. 1, 1981 | Feb. 1, 1984 | CPP-42-68-15 | Aetna Fire Underwriters Ins. Co. |
| Feb. 1, 1984 | Feb. 1, 1986 | MFC-DO-9948-48-A | INA Insurance Co. of Ohio |

ECF Doc. 1-1 (Policy No. 306-41-47); ECF Doc. 1-2 (Policy No. 392-20-07); ECF Doc. 1-3 (Policy No. 005-30-83-26); ECF Doc. 1-4 (Policy No. MXP-358-05-16); ECF Doc. 1-5 (Policy No. CPP-42-68-15); ECF Doc. 1-6 (Policy No. MFC-DO-9948-48-A); *see also* ECF Doc. 34-1 at 3-4 (discussing the Buckeye Union Insurance Company Policies); ECF Doc. 1 at 4 (¶9).  CNA is the successor-in-interest to the Buckeye Union Insurance Company contracts and the parent to Continental Casualty Company.  *See* ECF Doc. 1 at 3 n.4; ECF Doc. 29 at 3-4 n.2.  And ACE is the successor-in-interest to the Aetna and INA policies.  ECF Doc. 1 at 5 (¶15); ECF Doc. 10; ECF Doc. 11; ECF Doc. 29 at 3-4 n.2.

      **1.** **The CNA Policies**

          **a.** **Buckeye Union, Policy Nos. CBP-3693 and CBP-6596**

Beckett was unable to find policy documents for the Buckeye Union Insurance Co. policies, but Beckett Product Liability Manager Michael Smith attested that the terms of the policies were referenced in an FFIC excess liability policy for November 6, 1972, through Nov. 5, 1975.  ECF Doc. 34-1 at 3.  According to Smith, Policy No. CBP-3693 included an aggregate bodily injury limit of $300,000 and an aggregate property damage limit of $50,000.  ECF Doc. 34-1 at 3; *see also* ECF Doc. 1 at 4 (¶9).  Policy No. CBP-6596 had an aggregate bodily injury

limit of $300,000 and an aggregate property damage limit of $100,000.  ECF Doc. 34-1 at 3; *see also* ECF Doc. 1 at 4 (¶9).

### b.       Continental Casualty Co., Policy No. 306-41-47

Continental Casualty Co. Policy No. 306-41-47, which was in effect from December 31, 1976, through December 31, 1978, included general liability coverage.  ECF Doc. 1-1 at 4.  The policy set an aggregate bodily injury limit of $300,000 and an aggregate property damage liability of $100,000.  ECF Doc. 1-1 at 4.  And the policy noted that Continental based its premium calculations, in part, on Beckett's manufacturing of oil burners.  ECF Doc. 1-1 at 6.

### c.       Continental Casualty Co., Policy No. 392-20-07

Continental Casualty Co. Policy No. 392-20-07, which was in effect from December 31, 1978, through December 31, 1979, included general liability coverage.  ECF Doc. 1-2 at 7.  The policy set an aggregate bodily injury limit of $500,000 and an aggregate property damage limit of $250,000.  ECF Doc. 1-2 at 7.

### d.       Continental Casualty Co., Policy No. 005-30-83-26

Continental Casualty Co. Policy No. 005-30-83-26, which was in effect from December 31, 1979, through December 31, 1980, included general liability coverage.  ECF Doc. 1-3 at 2. The policy set an aggregate bodily injury limit of $500,000 and an aggregate property damage limit of $250,000.  ECF Doc. 1-3 at 2.

### 2.       Fireman's Fund Insurance Co., Policy No. MXP-358-05-16

Fireman's Fund Insurance Co., Policy No. MXP-358-05-16, which was in effect from February 1, 1980, through February 1, 1981[5], included comprehensive general liability insurance

---

[5] FFIC Policy No. MXP-358-05-16 states on its face that it was effective from February 1, 1980, through February 1, 1983.  ECF Doc. 1-4 at 1.  However, Beckett's complaint and FFIC's motion for summary judgment indicate that the policy was only in effect from February 1, 1980, through February 1, 1981.

7

coverage. ECF Doc. 1-4 at 1, 11-12, 16. The policy set an aggregate bodily injury limit of $500,000 and an aggregate property damage limit of $250,000. ECF Doc. 1-4 at 16. The policy provided that:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
>
> Coverage A. **bodily injury** or
> Coverage B. **property damage**
>
> To which this insurance applies caused by an **occurrence**, and the Company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage,** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.
>
> * * *
>
> This insurance does not apply * * * to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental.

ECF Doc. 1-4 at 16-17 (emphasis in original).

### 3.     ACE Insurance Policies

#### a.     Aetna Fire Underwriters Ins. Co., Policy No. CPP-42-68-15

Aetna Fire Underwriters Insurance Co., Policy No. CPP-42-68-15, which was in effect from February 1, 1981, through February 1, 1984, included comprehensive general liability coverage. ECF Doc. 1-5 at 1, 37. The policy set an aggregate bodily injury limit of $500,000 and an aggregate property damage limit of $250,000. ECF Doc. 1-5 at 37. And the policy

---

ECF Doc. 1 at 4 (¶12); ECF Doc. 29 at 5. Because the parties agree regarding the time the policy was in place, there is no dispute and the court accepts the parties agreed-upon facts.

specifically noted that Beckett's manufacturing of oil burners was among the activities considered in setting premiums.  ECF Doc. 1-5 at 38.  Further, the policy provided that "[i]f a claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative."  ECF Doc. 1-4 at 16-17.

### b.    INA Ins. Co. of Ohio, Policy No. MFC-DO-9948-48-A

INA Insurance Company of Ohio, Policy No. MF-DO-9948-48-A, which was in effect from February 1, 1984, through February 1, 1986, included general liability coverage.  ECF Doc. 1-6 at 3.  The policy set an aggregate bodily injury limit of $500,000 and an aggregate property damage limit of $250,000.  ECF Doc. 1-6 at 3.

## II.    Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018).  The moving party must demonstrate "the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted).  The nonmoving party may not simply rely on her pleadings, but "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted); *see also Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996) (The court does not have the responsibility to search the record *sua sponte* for genuine issues of fact).  A reviewing court must

determine whether the evidence that the nonmoving party relies upon "presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  In evaluating the evidence presented on a summary judgment motion, courts must draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 255.  Nonetheless, a court need not accept unsupported or conclusory statements as true.  *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").

### B.    Certification of Questions

Ohio S. Ct. Prac. R. 9.01(A), permits the certification of a question of law to the Ohio Supreme Court when: (1) it is "a question of Ohio law;" (2) an answer to the question "may be determinative of the proceeding;" and (3) "there is no controlling precedent in the decisions of [the Ohio] Supreme Court."  When those conditions are met, federal district courts have discretion to utilize the certification procedure.  *City of Columbus v. Hotels.Com, L.P.*, 693 F.3d 642, 654 (6th Cir. 2012).  "[B]ut the 'federal courts generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks.'"  *Id.* (quoting *Pennington v. State Farm Mut. Auto Ins. Co.*, 553 F.3d 447, 449-50 (6th Cir. 2009)).

In determining whether to exercise discretion to certify a question to the Ohio Supreme Court, federal courts generally consider: (1) whether the question invokes a vital interest of state sovereignty, such as the construction of a state constitutional provision or a state statute; (2) whether lower state court and federal court rulings allow the court to discern a reasonably clear and principled answer; (3) whether certification of the issue would save "time, energy, and resources;"  and (4) whether the certification proponent's motion to certify is timely.  *See*, *e.g.*,

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 75-79 (1997) (Arizona Supreme Court should have had the opportunity to address the construction of an Arizona constitutional provision, and certification of the issue would save "time, energy, and resources"); *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1059-61 (6th Cir. 1994) (Michigan Supreme Court should have the opportunity to address the construction of a provision under the Michigan Franchise Investment Law, and there was no reasonably clear result when federal court decisions directly conflicted in their interpretation of the statute); *Pennington*, 553 F.3d at 450 (6th Cir. 2009) (motion to certify was untimely when first sought after briefing on appeal, and existing caselaw was sufficient for the court to make a clear and principled decision regarding whether an insurance company could charge greater underinsured motorist premiums based on the number of insured drivers on a policy without being exposed to stacking); *Metz v. Unizan Bank*, 649 F.3d 492, 498 n.2 (6th Cir. 2011) (district court did not abuse its discretion in denying certification when Ohio law provided a clear and principled course for determining whether the discovery exception to the statute of limitations applied to actions under Ohio Rev. Code §§ 1304.9 and 1303.16(G)); *City of Columbus*, 693 F.3d at 654 (motion for certification was untimely when filed after the district court issued an order on the parties' motion for summary judgment).  *See also The Lincoln Electric Company v. Traveler's Cas. & Sur. Co.*, CM/ECF for N.D. Ohio Case No. 1:11-cv-2253, Doc. 112 (certification warranted when a question of Ohio law related to allocation of liability among insurance carriers would be outcome-determinative, would potentially avoid the costs of future litigation of the issue in the absence of controlling precedent, and did not have a reasonably clear resolution in light of conflicting state court and federal court decisions).

11

### III.    Law & Analysis

### A.    Pollution Exclusion

### 1.    Parties' Arguments

FFIC argues that it is entitled to summary judgment on Beckett's claims because the pollution exclusion in the FFIC policy (No. MXP-358-05-16) precludes coverage for the asbestos exposures alleged in the underlying litigation.  ECF Doc. 29 at 6-9.  Specifically, FFIC argues that the plain language of the pollution exclusion unambiguously applies to the underlying asbestos claims because: (1) asbestos is a toxic chemical, irritant, or contaminant; (2) the asbestos was released into the "atmosphere," which includes air in a residential basement; and (3) the alleged harm involved long-term asbestos exposure that Beckett cannot show met the "sudden and accidental" exception to the pollution exclusion.  ECF Doc. 29 at 6-9; ECF Doc. 36 at 1-10.  Further, FFIC contends that its previous decision not to deny coverage based on the pollution exclusion does not preclude raising the defense now and is not evidence that the pollution exclusion does not apply.  ECF Doc. 29 at 3; ECF Doc. 36 at 10-11.  FFIC also asserts that its decision not to include a specific asbestos exclusion does not mean that the asbestos claims are covered because such a clause would be redundant to the broader pollution exclusion. ECF Doc. 36 at 10-11.

Beckett responds that FFIC has not shown that the plain language of the pollution exclusion bars coverage because it is ambiguous whether the underlying asbestos exposure was the result of a "discharge, dispersal, release, or escape . . . into . . . the *atmosphere*."  ECF Doc. 34 at 6-10; ECF Doc. 40 at 1-13.  Specifically, Beckett argues that "atmosphere" is ambiguous because it has been construed to mean "air in the external environment," not air that is enclosed within a structure.  ECF Doc. 40 at 1-13.  Beckett asserts that such a construction comports with

12

the historical purpose behind the pollution exclusion – *i.e.*,  precluding coverage for large-scale environmental contaminations.  ECF Doc. 34 at 10-11.  Moreover, Beckett argues that FFIC's previous decisions to pay Beckett's claims and not to include a specific asbestos exclusion suggest that FFIC and Beckett intended for asbestos claims to be covered under the policy.  ECF Doc. 34 at 12.  Thus, Beckett contends that the court must construe the ambiguous terms of the exclusion in Beckett's favor, find that the exclusion does not apply to the underling claims, and deny FFIC's motion for summary judgment.  ECF Doc. 34 at 7, 10, 13.

In its motion to certify questions to the Ohio Supreme Court, FFIC argues that the court should certify a question regarding this issue because: (1) the application of the pollution exclusion would be dispositive to all of Beckett's claims; and (2) there is no controlling Ohio Supreme Court precedent regarding whether a pollution exclusion applies under the circumstances presented in this case.  ECF Doc. 41 at 3-4; ECF Doc. 44 at 1-2.  Beckett responds that certification is unnecessary because "into the atmosphere" is ambiguous under existing law and certification would only serve to delay resolution of this case.  ECF Doc. 43 at 3-4.

## 2.      Ohio Canons of  Contract Construction

In Ohio, insurance policies are contracts and are interpreted as a matter of law.  *City of Sharonville v. Am. Emplrs. Ins. Co.*, 109 Ohio St. 3d 186, 187 (2006).  Ohio courts employ a two-step process in interpreting such contracts, looking first to whether the language in the policy is clear and unambiguous.  *Selm v. Am. States Ins. Co.*, No. C-010057, 2001 Ohio App. LEXIS 4207, at *5 (Ohio App. Ct., Sep. 21, 2001) (citing *Cincinnati Indemnity Co. v. Martin*, 85 Ohio St.3d 604, 607 (1999)); *Owens-Corning Firberglas Corp. v. Allstate Ins. Co.*, 74 Ohio Misc.2d 144, 149 (Lucas Cty. Ct. Comm. Pls., Feb. 24, 1993) (citing *Karabin v. State Auto. Ins. Co.*, 10 Ohio St.3d 163,166-67 (1984)).  This inquiry requires courts to give contract terms their

plain and ordinary meaning.  *City of Sharonville*, 109 Ohio St.3d at 187; *see also Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 167-168 (Ohio S. Ct. 1982) ("[W]ords and phrases used in an insurance policy must be given their natural and commonly accepted meaning, where they in fact possess such meaning . . . .").  Courts must be careful not to create an ambiguity when none exists.  *Selm*, 2001 Ohio App. LEXIS 4207, at *5 (citing *Karabin*, 10 Ohio St.3d at 167).  If the terms of the contract are clear and unambiguous, the court's inquiry is complete, and it must enforce the contract as written.  *Selm*, 2001 Ohio App. LEXIS 4207, at *5 (citing *Cincinnati Indemnity Co.*, 85 Ohio St.3d at 607); *Owens-Corning Firberglas Corp.*, 74 Ohio Misc.2d at 149 ("'When the language of an insurance policy has a plain and ordinary meaning, it is unnecessary and impermissible for this court to resort to construction of the language.'" (quoting *Karabin*, 10 Ohio St.3d at 166-167)).

If the language is ambiguous, however, the court must proceed to construe the contract "'strictly against the insurer and liberally in favor of the insured.'"  *City of Sharonville*, 109 Ohio St.3d at 187 (quoting *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208 (1988)).  In doing so, the court may consider "'extrinsic evidence in its effort to give clear effect to the parties' intentions.'"  *Owens-Corning Fiberglas Corp.*, 74 Ohio Misc.2d at 149 (quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987)).  Here, "intent" means what an ordinary reader and purchaser of the policy would have reasonably understood the terms to mean.  *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 551 (2001).  "Additionally, 'an exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded.'" *City of Sharonville*, 109 Ohio St.3d at 187 (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 665 (1992)).

### 3.    Discharge, Dispersal, Release, or Escape

To show that the pollution exclusion applies, the first hurdle FFIC must overcome is to demonstrate that the asbestos was "discharge[d], dispers[ed], release[d], or escape[d]."  ECF Doc. 1-4 at 17.  Beckett's briefs do not quibble on this matter.  And for good reason.  The Supreme Court of Ohio has held that the terms "'discharge, dispersal, release or escape' . . . 'intrinsically evoke a transition from a state of confinement to movement.'"  *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 519 (2002) (specifically noting that "disperse" means "to spread or distribute from a fixed or constant source").  To cause a bodily injury as alleged in the underlying asbestos litigation, the asbestos particles must have transitioned from their encapsulated state within Beckett's oil burner gaskets and become airborne in the residential basements where burners were located.  *Cf. Insurance Co. of N. Am. v. Forty-Eight Insulations*, 633 F.2d 1212, 1214 (6th Cir. 1980) ("[A]sbestos has many commercial uses . . . .  The problem is that tiny asbestos particles can become airborne when . . . asbestos materials are used at a construction or other site.");  ECF Doc. 34-1 at 2-3 (¶¶6-8, 12).  Moreover, even if Beckett were to argue that some other party must have caused the "discharge, dispersal, release, or escape" of the asbestos in this matter, such an argument would be unavailing because the language does not limit exclusion to a particular manner or facilitator of the "discharge, dispersal, release, or escape."  *See Owens-Corning Firberglas Corp. v. Allstate Ins. Co.*, 74 Ohio Misc.2d 144, 154 (Lucas Cty. Ct. Comm. Pls., Feb. 24, 1993) ("'The discharge applies to *any* discharge * * * the manner in which a pollutant, irritant, or contaminant is released, alone, has no bearing on the application of the standard pollution exclusion.").

Therefore, under the plain language of the FFIC policy's pollution exclusion, the asbestos was clearly "discharge[d], dispers[ed], release[d], or escape[d]" into the residential basement air where Beckett's oil burners were located. *Martin*, 85 Ohio St.3d at 607; *Karabin*, 10 Ohio St.3d

at166-67 *Selm*, 2001 Ohio App. LEXIS 4207, at *5; *Owens-Corning Firberglas Corp.*, 74 Ohio Misc.2d at 149.  Because this sub-issue is not disputed and the result is clear under existing law, there is no need to "trouble our sister state courts" to determine whether the asbestos exposure underlying this case involved a "discharge, dispersal, release, or escape" under Ohio law.  *City of Columbus*, 693 F.3d at 654.

### 4.     Irritant, Contaminant, or Pollutant

Next, FFIC must establish that asbestos is plainly an "irritant," "contaminant," or "pollutant."  ECF Doc. 1-4 at 17 ("smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials, or other irritants, contaminants, or pollutants").  Whether Beckett contests or concedes this point is unclear.  *Compare* ECF Doc. 34 ("Even if asbestos could be considered an 'irritant' or 'contaminant,' which Beckett expressly denies . . . ."), *with* ECF Doc. 40 at 1-2 ("The central dispute . . . is whether the word 'atmosphere' is meant to include air within a residential basement or not.  If it does, then the FFIC Pollution Exclusion applies . . . .").

The Ohio Supreme Court has not directly addressed whether asbestos is an "irritant," "contaminant," or "pollutant."  Nevertheless, this court need not trouble the state courts with this question because existing case law is sufficiently clear for the court to "make an *Erie* guess to determine how [the Ohio Supreme Court], if presented with the issue, would resolve it.'"  *IMG Worldwide, Inc. v. Great Divide Ins. Co.*, 704 F. App'x 562, 566 (6th Cir. 2017) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358-59 (6th Cir. 2013)).

Asbestos' nature may have been an open question when the Lucas County Court of Common Pleas confronted it in *Owens-Corning Fiberglas Corp.  See* 74 Ohio Misc.2d at 149 ("It . . . is far from certain whether asbestos constitutes an 'irritant,' 'contaminant,' or 'pollutant'

. . . ."). But the Ohio Court of Appeals has since answered it, holding that "[t]here is no doubt that asbestos is an irritant or contaminant, and therefore a pollutant under" a similar pollution exclusion. *Selm*, 2001 Ohio App. LEXIS 4207, at *10. The Sixth Circuit's description of the health consequences of exposure to airborne asbestos fibers in *Insurance Co. of N. Am.* also supports the Ohio Court of Appeals' conclusion that asbestos is an irritant, contaminant, or pollutant. 633 F.2d at 1214 (explaining that airborne asbestos fibers cause irritation in and become encapsulated in lung cells when inhaled, leading to diseases such as mesothelioma, lung cancer, and asbestosis). And because this court is not convinced that the Ohio Supreme Court would rule otherwise, it must accept the Ohio Court of Appeals conclusion that asbestos is an "irritant," "contaminant," or "pollutant." *IMG Worldwide, Inc.*, 704 F. App'x at 566 ("'Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently.' *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).").

Therefore, under the plain language of the FFIC policy's pollution exclusion, the underlying asbestos claims involved an "irritant," "contaminant," or "pollutant." *Martin*, 85 Ohio St.3d at 607; *Karabin*, 10 Ohio St.3d at 166-67; *Selm*, 2001 Ohio App. LEXIS 4207, at *5; *Owens-Corning Firberglas Corp.*, 74 Ohio Misc.2d at 149. And, once more, the court need not "trouble our sister state courts" to determine whether asbestos is an "irritant," "contaminant," or "pollutant." *City of Columbus*, 693 F.3d at 654.

### 5. Into the Atmosphere

The final prong FFIC must satisfy to show that the asbestos exposures alleged in the underlying litigation falls within the pollution exclusion is that the asbestos was released "into . . . the *atmosphere*." ECF Doc. 1-4 at 17 (emphasis added). Neither the parties' nor the court's

own research has revealed a decision by the Ohio Supreme Court addressing whether "atmosphere" in the context of a pollution exclusion includes the air within a residential basement.

### a.    Authority Favoring FFIC

To support its proposition that air inside a residential basement is within the meaning of "atmosphere" in the pollution exclusion, FFIC primarily relies upon the Ohio Court of Appeals' decisions in *Selm*, 2001 Ohio App. LEXIS 1103509 (holding that coverage for claims involving a contractor's release of asbestos into the air of a residential kitchen was barred under an absolute pollution exclusion), and *GrafTech Int'l, Ltd. v. Pac. Emplrs. Ins. Co.*, 2017-Ohio-9271 (holding that coverage for claims involving employees' exposure to toxic coal tar pitch used in their work areas were excluded under a pollution exclusion). ECF Doc. 29 at 7.  But neither of those cases addressed the meaning of "atmosphere."  *See Selm*, 2001 Ohio App. LEXIS 1103509, at *2-3, 7-8 (policy precluding coverage for *any* release, without any limitation regarding the location of the release); *GrafTech Int'l, Ltd.*, 2017-Ohio-9271, at ¶9 (policy precluding coverage for "introduction into the environment" and expressly defining "environment" to include "any air, . . . structure or air therein").

FFIC also points to the Sixth Circuit's decisions in: (1) *Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492 (6th Cir. 2010) (coverage for asbestos clean-up after a fire was excluded under a pollution exclusion); (2) *Park-Ohio Indus., Inc. v. Home Indem. Co.*, 975 F.2d 1215 (6th Cir. 1992) (coverage for workers exposed to fumes released from furnaces used to burn rubber off parts of military vehicles was excluded under pollution exclusion); (3) *United States Fid. & Guar. Co. v. Jones Chems. Inc.*, No. 98-4018, 1999 U.S. App. LEXIS 24306 (6th Cir. 1999) (coverage for industrial cleaning company's employees' exposure to liquid and gas chlorine

while cleaning a chemical storage tank was excluded under pollution exclusion); and *Pure Tech Sys. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132 (6th Cir. 2004) (coverage for water reclamation system contamination in oil processing and recycling facility was excluded under pollution exclusion).[6]  ECF Doc. 29 at 8; ECF Doc. 36 at 3.  But *Whitt Mach., Inc.*, *Jones Chems., Inc.*, and *Pure Tech Sys.* did not address the meaning of "atmosphere" because the pollution exclusions in those cases did not include such a limitation.  *Whitt Mach., Inc.*, 377 F. App'x at 495; *Jones Chems. Inc.*, 1999 U.S. App. LEXIS 24306, at *3-4; *Pure Tech Sys.*, 95 F. App'x at 133.  Similarly, *Park-Ohio Indus., Inc.*, though involving a pollution exclusion identical to the one in the FFIC policy, did not specifically address the meaning of "atmosphere," likely because the complaints filed in the litigation underlying that case specifically alleged a release of "carcinogenic agents into the atmosphere."  975 F.3d at 1217.  Thus, the meaning of "atmosphere" was not in dispute.[7]  *Id.* at 1219-24.

### b.  Authority Favoring Beckett

Beckett relies on the only Ohio state court decision that: (1) involves both asbestos-based products liability claims and an insurance company's refusal of coverage based on a pollution exclusion identical to the one in the FFIC policy; and (2) specifically addresses the meaning of "atmosphere": *Owens-Corning Firberglas Corp.*, 74 Ohio Misc.2d at 147, 149, 154-56.  ECF Doc. 34 at 8-9; ECF Doc. 40 at 5.  In that case, the state court noted that Webster's dictionary

---

[6] FFIC also cites *Manufacturers Gasket Co. v. Transcontinental Ins. Co.*, No. 93-3108, 1993 U.S. App. LEXIS 29678 (6th Cir. 1993); however, that is a summary decision that does not specifically describe the underlying claims, or the language of the pollution exclusion involved.

[7] In his dissent, Judge Ralph B. Guy, Jr. asserted that the pollution exclusion was ambiguous because: (1) the limitation – "into or upon land, the atmosphere, or any water course or body of water" – indicated that coverage was only excluded for the release of pollutants into the environment; and (2) the fact that courts in other jurisdictions had interpreted the exclusion differently made it ambiguous as a matter of Ohio law.  *Park-Ohio Indus., Inc.*, 975 F.3d at 1224-25 (citing *Equitable Life Ins. Co. v. Gerwick*, 50 Ohio App. 277 (Ohio App. Ct. 1934), and *George H. Olmstead & Co. v. Metropolitan Life Ins. Co.*, 118 Ohio St. 421 (1928)).

"define[d] 'atmosphere' as '1. The gaseous mass surrounding a celestial body, especially the earth. 2. Environment: surroundings.'" *Owens-Corning Firberglas Corp.*, 74 Ohio Misc.2d at 155. The court noted that the dictionary definition did not exempt the air inside or immediately surrounding a building from "atmosphere," but noted that several courts had made the distinction in other asbestos-related cases. *Id.* (specifically noting that a California court had ruled that "'the release of asbestos fibers in the workplace or home cannot reasonably be construed to be a release into the atmosphere'"). Further, the court noted that, looking at the entire context of the exclusion as a whole – "into or upon land, the atmosphere or any water course or body of water" – it was clear that the exclusion precluded coverage for pollution of the external environment. *Id.* at 156. Thus, the court determined that the release of asbestos fibers inside a building could not "be classified as one 'into the atmosphere' as a matter of law." *Id.*

Like FFIC, Beckett also cites Ohio Court of Appeals and Sixth Circuit decisions as support. ECF Doc. 34 at 10. For example, Beckett points to *Bosserman Aviation Equip., Inc. v. United States Liab. Ins. Co.*, 183 Ohio App.3d 29 (Ohio App. Ct. 2009) (coverage not excluded when employee exposed to benzine and other harmful chemicals in aircraft fuel while he serviced aircraft refueling equipment), and *Lumbermens Mut. Casualty Co. v. S-W Indus.*, 39 F.3d 1324 (6th Cir. 1994) (coverage not excluded when employee was exposed to toxic fumes from chemicals that he used in performing his job duties). However, *Bosserman* did not address the meaning of "atmosphere" because the exclusion language did not include it. 183 Ohio App. 3d at 31. And *Lumbermens* concluded that "atmosphere" did not include confined areas, such as the employee's work station. 39 F.3d at 1336. Most importantly, however, Beckett also cites the Ohio Supreme Court decision in *Andersen v. Highland House Co.*, 93 Ohio St.3d 547 (2001) (coverage not excluded when tenants died or were injured after inhaling carbon monoxide

20

released into their residence by a faulty heating unit).  ECF Doc. 34 at 10-12.  Although

*Andersen* did not specifically address the meaning of "atmosphere" – because that limitation did

not appear in the language of the exclusion – the court gave great weight to the historical

motivation behind the pollution exclusion – the desire to bar coverage when the government

mandated cleanup for large-scale environmental contamination.  93 Ohio St.3d at 547-50.  And

that decision suggests that the Ohio Supreme Court might find the reasoning in *Owens-Corning*

*Fiberglas Co.* and *Lumbermens* more persuasive than the decisions in *Selm* and the other cases

that FFIC relies upon.

<b>c.      Certification</b>

On the surface, the conflict among existing Ohio and Sixth Circuit case law coupled with

the lack of controlling precedent from the Ohio Supreme Court would appear to favor

certification of this question to the Ohio Supreme Court.  *See* Ohio S. Ct. Prac. R. 9.01(A).

Certification would be alluring if the issue before the court were purely "what does 'atmosphere'

mean."  But that is not the question before the court.  Instead, the court must ask whether the

meaning of "atmosphere" is plain or ambiguous under Ohio law.  *City of Sharonville*, 109 Ohio

St.3d at 187.  And existing case law is sufficient for this court to discern a reasonably clear and

principled answer to that question.  *Arizonans for Official English*, 520 U.S. at 75-79.

Because there is no existing Ohio Supreme Court precedent defining "atmosphere," and

the conflict among existing Ohio and Sixth Circuit case law leaves the meaning of "atmosphere"

susceptible to multiple interpretations, the court concludes that "atmosphere" is ambiguous with

regard to whether it includes the air in a residential basement.  *See Equitable Life Ins. Co. v.*

*Gerwick*, 50 Ohio App. 277, 281 (Ohio App. Ct. 1934) ("Whe[n] the language of a clause used in

an insurance contract is such that courts of numerous jurisdictions have found it necessary to

21

construe it and in such construction have arrived at conflicting conclusions as to the correct meaning, intent and effect thereof, the question of whether such clause is ambiguous ceases to be an open one.").

### d.    Parties' Intent

Having found the language meaning of "atmosphere" ambiguous in the context of the FFIC policy's pollution exclusion, the court may consider extrinsic evidence of the parties' intent and must construe that evidence in Beckett's favor. *City of Sharonville*, 109 Ohio St.3d at 187; *Owens-Corning Fiberglas Corp.*, 74 Ohio Misc.2d at 149.  But FFIC has not pointed to any extrinsic evidence of what it meant when it used the word "atmosphere" in its pollution exclusion much less evidence that conclusively establishes that both FFIC and Beckett understood that asbestos claims would be excluded. *See generally* ECF Doc. 29; ECF Doc. 36 (arguing only that the pollution exclusion was unambiguous and precluded coverage).  FFIC's failure to produce any evidence of intent renders its argument categorically insufficient to establish that there is no genuine dispute as to the parties' intent regarding whether the FFIC policy excluded coverage for asbestos claims. *See Celotex Corp.*, 447 U.S. at 324 (requiring summary judgment motions to be supported by references to evidence).  Thus, construing in Beckett's favor the possible meanings of "atmosphere" as identified in *Owens-Corning Fiberglas Corp.*, the court must conclude that the parties intended "atmosphere" to mean the air in the external environment and not the air in a residential basement or otherwise enclosed within a structure. *Owens-Corning Fiberglas Corp.*, 74 Ohio Misc.2d at 155-56; *see also City of Sharonville*, 109 Ohio St. 3d at 187.  Thus, the pollution exclusion does not clearly bar coverage for the asbestos claims underlying this case. *City of Sharonville*, 109 Ohio St. 3d at 187.

### 6.    Summary

Existing caselaw (1) makes clear that the underlying asbestos exposure involved a "discharge, dispersal, release, or escape" of an "irritant," "contaminant," or "pollutant"; and (2) is sufficient for the court to determine whether the meaning of "atmosphere" is ambiguous under the circumstances of this case.  Thus, the court declines to exercise its discretion to certify a question to the Ohio Supreme Court regarding whether the pollution exclusion in the FFIC policy precludes coverage for the underlying asbestos claims.  *City of Columbus*, 693 F.3d at 654; *Pennington*, 553 F.3d at 449-50; *Arizonans for Official English*, 520 U.S. at 75-79. Therefore, FFIC's motion to certify must be DENIED with regard to FFIC's first question.

Further, because FFIC has not carried its burden to prove that there is no genuine issue of material fact as to the applicability of the pollution exclusion and that coverage of Beckett's claims is barred as a matter of law, FFIC's motion for summary judgment on the basis of the pollution exclusion must be DENIED.  Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d at 258.

**B.    Settlement Credits**

**1.    Parties' Arguments**

Next, FFIC asks for summary judgment declaring that, as a matter of law, it is entitled to a credit up to the full limits of the settled CNA-affiliated policies before it makes any further payments to Beckett.  ECF Doc. 29 at 9-15; ECF Doc. 36 at 11-16.  FFIC contends that Beckett merely seeks to avoid picking up CNA's share for the litigation costs, that Beckett would receive a double recovery if settlement credits are not imposed, and that FFIC is entitled to settlement credits because Beckett's decision to settle with CNA precludes any contribution claim by FFIC against CNA.  ECF Doc. 29 at 9-10, 14-15; ECF Doc. 36 at 11.  Further, FFIC asserts that Beckett had a duty to preserve FFIC's right to contribution against CNA and cooperate in FFIC's pursuit of its contribution claims.  ECF Doc. 36 at 13-14.  Moreover, FFIC contends that

Beckett's settlement with CNA effectively rendered Beckett uninsured for the periods during which it held CNA-affiliated policies, and, therefore, FFIC may seek contribution against Beckett itself.  ECF Doc. 36 at 12-13.  Thus, FFIC argues that, even if there is a dispute about the *amount* of settlement credits due, the court should at least conclude that FFIC is entitled to some amount of settlement credits.  ECF Doc. 36 at 16; ECF Doc. 29 at 15 (asking for the full limits of the CNA-affiliated policies).

Beckett responds that FFIC is not entitled to a contribution claim against either CNA or Beckett because: (1) the buy-back settlement exhausted the CNA-affiliated policies; and (2) *Goodyear Tire & Rubber Co. v. Aetna Casualty & Surety Co.*, 95 Ohio St.3d 512 (2002), precludes contribution claims against a policy holder by removing uninsured periods from the allocation equation.  ECF Doc. 34 at 13; ECF Doc. 40 at 13.  Further, Beckett argues that settlement credits would not be appropriate because FFIC has not established that the claims settled in the CNA settlement were coextensive with Beckett's claims against FFIC.  ECF Doc. 34 at 15-16; ECF Doc. 40 at 14-16.  Beckett also argues that it would not receive a double recover if FFIC were denied settlement credits because the money it received from CNA was to reimburse payments Beckett had already made in defending the underlying asbestos claims.  ECF Doc. 34 at 16-17.  Moreover, Beckett rejects FFIC's claim that a pro rata distribution based on the insurance carriers' time on risk is appropriate because the Ohio Supreme Court adopted an all-sums approach and rejected the pro rata, time on risk approach for distributing costs among insurance carriers.  ECF Doc. 40 at 13-14.  Finally, Beckett asserts that FFIC is not entitled to settlement credits because it has not met its burden to establish the credit amount, if any, is due at all.  ECF Doc. 34 at 16-18; ECF Doc. 40 at 14-16.

In its motion to certify, FFIC argues that the court should certify a question regarding whether a non-settling primary insurance carrier is entitled to settlement credits when the insured settles with another primary insurance carrier.  ECF Doc. 41.  FFIC argues that certification is proper because: (1) the issue involves a question of Ohio law without precedent from the Ohio Supreme Court; (2) the question would be dispositive of an issue in this case; and (3) existing law is insufficient for this court to arrive at a reasonably clear answer.  ECF Doc. 41 at 3-4.

### 2. Existing Ohio Case Law

Neither the Ohio Supreme Court nor the Ohio Court of Appeals has directly answered the second issue in FFIC's motion to certify and motion for summary judgment – whether settlement credits are available to a non-settling primary insurance carrier when the policyholder settles its claims against another primary insurance carrier with whom the non-settling primary insurance carrier had previously been a participant in a cost-sharing agreement.[8]

Under Ohio law, primary insurance carriers whose policies were in effect at some point during a period of exposure or contamination forming the basis for a long-term injury are jointly and severally liable under the "all sums" approach.  *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 515-17 (2001); *see also Penn. Gen. Ins. Co. v. Park-Ohio Indus.*, 126 Ohio St.3d 98, 102 (2010).  The "all sums" approach permits a policyholder to select a single carrier from which it may obtain coverage up to the applicable policy limits for that carrier.  *Goodyear Tire & Rubber Co.*, 95 Ohio St.3d at 515-17; *Penn. Gen. Ins. Co.*, 126 Ohio St.3d at 102.  If the target carrier's policy limits are insufficient to cover the claim, then the policyholder may pursue its claims against another target carrier and repeat the process until the claim is satisfied or all the policy limits are reached.  *Goodyear Tire & Rubber Co.*, 95 Ohio

---

[8] FFIC's question is reworded here to reflect more accurately the circumstances of this case.

25

St.3d at 517; *Penn. Gen. Ins. Co.*, 126 Ohio St.3d at 102.  The targeted carriers may then seek contribution from the non-targeted and/or under-targeted carriers, so that the burden of coverage is fairly distributed among the jointly and severally liable carriers.  *Goodyear Tire & Rubber Co.*, 95 Ohio St.3d at 516; *Penn. Gen. Ins. Co.*, 126 Ohio St.3d at 102.  In adopting this approach, the Ohio Supreme Court expressly rejected the pro-rata allocation scheme, which allocates loss among the multiple insurance carriers upfront by limiting their liability in proportion to time on risk.  *Goodyear Tire & Rubber Co.*, 95 Ohio St.3d at 515-17; *Penn. Gen. Ins. Co.*, 126 Ohio St.3d at 102.

A contribution claim is a suit in equity, permitting courts to allocate a loss among multiple insures who cover the same risk, so that each pays its fair share and one does not profit at the expense of another.  *See IMG Worldwide, Inc. v. Great Divide Ins. Co.*, 704 F. App'x 562, 566 (6th Cir. 2017); *Clarendon Nat'l Ins. Co. v. Lexington Ins. Co.*, 312 F. Supp. 3d 639, 645 (N.D. Ohio 2018).  But a settlement between a policyholder and one of its primary carriers has important ramifications for this allocation scheme.  In *OneBeacon Am. Ins. Co. v. Am. Motorists Ins. Co.*, the Sixth Circuit determined, based on a review of Ohio state court decisions and decisions by this court, that a settlement which exhausted the settling insurer's policy precluded non-settling insurers from seeking equitable contribution from the settling insurer.  679 F.3d 456, 463 (6th Cir. 2012); *see also GenCorp, Inc. v. AIU Ins. Co.*, 297 F. Supp. 2d 995, 997-1000, 1007 (N.D. Ohio 2003); *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, No. 1:03-cv-1322, 2007 U.S. Dist. LEXIS 7448, at *13-15 (N.D. Ohio, Feb. 1, 2007).  The court explained that such a result found support in both Ohio Supreme Court policy and the Ohio Revised Code.  *Id.* (citing *Krischbaum v. Dillon*, 58 Ohio St. 3d 58, 69 (1991) ("The law favors prevention of litigation by compromise and settlement."), and Ohio Rev. Code § 2307.28(B) ("The release or

covenant discharges the person to whom it is given from all liability for contribution to any other tortfeasor.")).

When such a settlement precludes non-settling carriers from seeking equitable contribution, Ohio law may permit the non-settling carriers to seek another form of equitable relief: the settlement credit. *Goodrich Corp. v. Commercial Union Ins. Co.*, 2008-Ohio-3200, at ¶¶38-39; *OneBeacon Am. Ins. Co.*, 679 F.3d at 461; *Bondex Int'l, Inc.*, 2007 U.S. Dist. LEXIS 7448, at *1-4.  Rather than being rooted in the concept of the proportional allocation of loss among insurance carriers, the settlement credit is an affirmative defense rooted in the principle that a settling policyholder should not be permitted to obtain a "double recovery" or "windfall" and render the non-settling insurer liable for more than its contracted-for share of liability. *Goodrich Corp.*, 2008-Ohio-3200, at ¶¶38-39; *OneBeacon Am. Ins. Co.*, 679 F.3d at 461; *Bondex Int'l, Inc.*, 2007 U.S. Dist. LEXIS 7448, at *4.  Thus, to show that settlement credits should be applied, the carrier must prove that the policyholder would receive a double recovery in the absence of settlement credits by demonstrating that the compensation paid by the settling carrier was for the "same damages" underlying the claim against the non-settling insurer. *Goodrich Corp.*, 2008-Ohio-3200, at ¶¶38-39, 46.

### 3.    Certification

Beckett is correct that certification is not warranted on this issue.  *See* ECF Doc. 43 at 4-5.  Although the lack of Ohio Supreme Court and Ohio Court of Appeals cases deciding whether settlement credits are available to non-settling primary insurers under the circumstances presented in this case would ordinarily favor certification, certification is unnecessary because an answer to that question is not necessary to resolve this case.  Ohio S. Ct. Prac. R. 9.01(A); *City of Columbus*, 693 F.3d at 654.  Even if this court were to assume that the Ohio Supreme Court

would determine that settlement credits are available under such circumstances, FFIC has not met its burden to show that settlement credits should be applied.

Even if the Ohio Supreme Court were to determine that settlement credits would be available to non-settling primary insurance carriers under the circumstances presented in this case, existing case law makes reasonably certain that the court would require such carriers seeking settlement credits to demonstrate that the compensation paid by the settling carrier was for the "same damages" underlying the claim against the non-settling insurer. *See Goodrich Corp.*, 2008-Ohio-3200, at ¶¶38-39, 46. And FFIC cannot meet its burden to show that the undisputed record evidence establishes that the compensation paid to Beckett pursuant to the CNA settlement was for the "same damages" underlying Beckett's claim against FFIC. *Goodrich Corp.*, 2008-Ohio-3200, at ¶¶38-39, 46; Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258. Here, it is important to note that Beckett's lawsuit against CNA sought reimbursement for the $2,306,312.24 in defense and settlement costs that Beckett paid out-of-pocket between 1998 and 2014; whereas, Beckett's lawsuit against FFIC and ACE seeks reimbursement for the still-accruing defense and settlement costs that Beckett has paid and continues to pay out-of-pocket following the November 2017 CNA settlement.[9] *Compare* ECF Doc. 1 at 9-12, *with* CM/ECF for N.D. Ohio Case No. 1:17-cv-856, Doc. 1-1 at 6-8. The record evidence shows that the CNA settlement released all of Beckett's claims under the CNA-affiliated policies – including Beckett's claims for reimbursement of the $2,306,312.24 in litigation and settlement costs Beckett paid between 1998 and 2014, claims related to the ongoing asbestos litigation, and claims for any future liabilities (asbestos-related or otherwise) that might have arisen under the

---

[9] When Beckett filed its complaint, it alleged that it had paid out-of-pocket a total of $149,901.65 in defense and settlement costs after the CNA settlement. ECF Doc. 1 at 9-11. This figure included $136,839.15 in various litigation costs and $13,062.50 in settlements. ECF Doc. 1 at 9-10. When Smith gave his affidavit testimony, the settlements figure was $29,678.00. ECF Doc. 34-1 at 6 (¶27).

CNA-affiliated policies.  *See* ECF Doc. 31; *see also* ECF Doc. 29 at 4; ECF Doc. 34-1 at 5.  The claims encompassed within the settlement are, therefore, far broader than the claims Beckett has brought against FFIC.  *Compare* ECF Doc. 1 at 9-12, *with* ECF Doc. 31; *see also Goodrich Corp.*, 2008-Ohio-3200, at ¶¶41-46 (overruling the grant of settlement credits when the settlement released the settling carriers from "a much wider array of claims" than the claims seeking coverage for contamination cleanup – including *all* potential claims for personal injury and property damage).  Thus, because FFIC cannot show that the compensation in the CNA settlement is coextensive with the damages Beckett seeks to recover from FFIC, FFIC has not carried its burden to demonstrate that it is entitled to settlement credits as a matter of law. *Goodrich Corp.*, 2008-Ohio-3200, at ¶¶38-39, 46; Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258.

Because existing case law is sufficient to determine that FFIC is not entitled to settlement credits – even if settlement credits were available to a non-settling primary insurance carrier when the policyholder settles its claims against another primary insurance carrier with whom the non-settling primary insurance carrier previously had a cost-sharing agreement – FFIC has not shown that certification of this question to the Ohio Supreme Court is necessary.  Further, because FFIC cannot show that the claims settled in the CNA settlement were coextensive with Beckett's claims against FFIC, FFIC's motion for summary judgment on the issue of settlement credits must be DENIED.

### C.      Contribution[10]

As an alternative to an award of settlement credits, FFIC asserts that it may seek a contribution claim against Beckett because the CNA settlement left Beckett uninsured for the periods during which the settled CNA-affiliated policies were in effect.  ECF Doc. 29 at 10-11,

---

[10] The court notes that FFIC's motion to certify does not seek certification of a question related to its contribution argument.  *See generally* ECF Doc. 41; ECF Doc. 44.

14-15; ECF Doc. 36 at 13.  The gravamen of FFIC's argument is that, in lieu of settlement credits, Beckett should not be able to increase FFIC's risk burden by forcing FFIC to pick up the shortfall between the CNA settlement amount and the CNA-affiliated policies' proportional risk burden.  ECF Doc. 29 at 10-11, 14-15; ECF Doc. 36 at 13.  Beckett responds that Ohio law would bar a contribution claim against a settling policyholder under the all-sums approach implemented in *Goodyear Tire & Rubber Co.*  ECF Doc. 40 at 13-14.

In support of its position, FFIC cites *Fulmer v. Insura Prop. & Cas Co.*, 94 Ohio St.3d 85 (2002), for the proposition that a policyholder cannot increase an insurance carrier's risk burden; ECF Doc. 29 at 10-11.  But it is hard to see how *Fulmer* supports FFIC's argument for contribution.  In that case, the Ohio Supreme Court addressed the effect of a plaintiff's settlement with a primarily-liable carrier (a tortfeasor's car insurance company) on the plaintiff's pursuit of coverage from a successively-liable carrier (the plaintiff's underinsured motorist carrier).  *Fulmer*, 94 Ohio St.3d at 86-88.  The court determined that, although the settlement exhausted the primarily-liable carrier's policy and triggered the successively-liable carrier's duty to defend, the successively-liable carrier had only contracted to cover sums exceeding the primarily-liable carrier's policy limits.  *Id.* at 95-96.  The court determined that it was necessary to "protect[ the successively-liable carrier] from paying more than it bargained for by giving it credit for the full amount of the [primarily-liable] tortfeasor's available policy limit."  *Id.* at 95.  Or, in other words, the plaintiff could only seek coverage from the successively-liable carrier for sums exceeding the primarily-liable carrier's policy limit.  *See id.* at 95-96.  This case effectively stands for the proposition that a policyholder's settlement cannot increase a carrier's liability by converting that carrier from successively-liable to primarily and jointly and severally liable.  *Cf. id.*

30

But that is not what Beckett seeks to do.  FFIC is not a successively-liable carrier.  FFIC is a primarily-liable carrier that is jointly and severally liable with Beckett's other carriers because it contracted to pay "all sums."  ECF Doc. 1-4 at 16 ("[FFIC] will pay on behalf of [Beckett] *all sums* which [Beckett] shall become legally obligated to pay as damages because of * * * bodily injury . . . (emphasis added)); *see also Goodyear Tire & Rubber Co.*, 95 Ohio St. 3d at 515-17; *Penn. Gen. Ins. Co.*, 126 Ohio St. 3d at 102.

FFIC also cites a string of out-of-state case law for the proposition that an insurance carrier whose policy was active during a long-term exposure may seek *pro rata* allocation or contribution from the policyholder for periods during which the policyholder was uninsured. ECF Doc. 36 at 12-13.  But most of the cases FFIC cites involve states that adopted the *pro rata* allocation scheme, rather than the all sums allocation scheme used in Ohio.  *See* ECF Doc. 36 at 12-13 (citing *Bradford Oil Co., Inc. v. Stonington Ins. Co.*, 190 Vt. 330 (2011); *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 370-72 (Mass. 2009); *Franklin Mutual Ins. Co. v. Metropolitan Prop. & Cas. Ins. Co.*, 406 N.J. Super. 586 (App. Div. 2009); *Olin Corp. v. Insurance Co. of N. Am.*, 221 F.3d 307, 323 (2d Cir. 2000); *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 722 N.W.2d 283 (Minn. 2006); *Sharon Steel Corp. v. Aetna Casualty & Sur. Co.,* 931 P.2d 127, 140-42 (Utah 1997)[11]; *Missouri Pac. R.R. Co. v. International Ins. Co.*, 288 Ill. App. 3d 69, 80-84 (2d Dist.); and *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 731-33 (Minn. 1997)).  The most favorable case in FFIC's string citation is *Wheeling Pittsburgh Corp. v. Am. Ins. Co.*, No. 93-c-340, 2003 W.V. Cir. LEXIS 3 (Ohio Cty. Cir. Ct., Oct. 28, 2003).  ECF

---

[11] Interestingly, the Supreme Court of Utah in *Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, followed *Sharon Steel Corp.*'s time-on-risk (pro rata) allocation formula, but declined to follow *Sharon Steel Corp.* in apportioning defense costs to the policyholder for the periods during which the policyholder was uninsured.  2012 U.T. 1, at ¶28 (Utah 2012) (holding that such apportionment would be unfair because the insurance policies gave the carriers the right to control the underlying litigation).  FFIC's reliance on that portion of the *Sharon Steel Corp.* decision is, therefore, questionable.

Doc. 36 at 13.  In that case, a West Virginia trial court adopted the all sums (joint and several) allocation scheme and also determined that a jointly and severally liable carrier could seek contribution from a policyholder for periods when the policyholder "elected not to obtain insurance or chose to self-insure."  *Wheeling Pittsburgh Corp.*, 2003 W.V. Cir. LEXIS 3, at *46, 53-54.

The *Wheeling Pittsburgh Corp.* decision could be persuasive in this case if FFIC could show that Beckett "elected not to obtain or chose to self-insure" at any point during the relevant period.  *Id.*; *see also Insurance Co. of N. Am. v. Forty-Eight Insulations*, 633 F.3d 1212, 1224 (6th Cir. 1980) (holding, in a case applying Michigan law, that an uninsured manufacturer "ha[d] to bear its pro-rata share of the costs of defense").  But FFIC has not done so.  The record evidence – construed in a light most favorable to Beckett – shows that Beckett *was* insured during the relevant period.  *See* ECF Doc. 1-1; ECF Doc. 1-2; ECF Doc. 1-3; ECF Doc. 1-4; ECF Doc. 1-5; ECF Doc. 1-6; ECF Doc. 34-1 at 3 (¶14).  Moreover, FFIC has not cited any authority indicating that a policyholder who settles with a jointly and severally liable primary carrier is rendered uninsured for the settled policies' coverage periods and must be held to account when pursuing coverage from its yet-unexhausted policies.  *See generally* ECF Doc. 36 at 13.  And this court is not persuaded that the Ohio Supreme Court would agree with FFIC's unsupported proposition.  Such a course would be antithetical to: (1) the Ohio Supreme Court's statements in *Goodyear Tire & Rubber Co.* and *Penn. Gen. Ins. Co.* permitting a policyholder to seek coverage from another jointly and severally liable carrier once the originally-targeted carrier's policy is exhausted; and (2) the policy behind precluding contribution claims against settling carriers.  *Goodyear Tire & Rubber Co.*, 95 Ohio St.3d at 515-17; *Penn. Gen. Ins. Co.*, 126 Ohio St.3d at 102; *OneBeacon Am. Ins. Co.*, 679 F.3d 463.

Thus, FFIC has not carried its burden to show that it is entitled as a matter of law to contribution from Beckett for the periods during which the settled CNA-affiliated policies were in effect. Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d at 258. Accordingly, FFIC's alternative request for summary judgment on the issue of contribution must be DENIED.

### D. Bad Faith[12]

Finally, FFIC argues that it is entitled to summary judgment on Beckett's bad faith claim because FFIC "never denied coverage for Beckett's asbestos liabilities" but only refused to cover the share that CNA had been paying. ECF Doc. 29 at 15. Further, FFIC asserts that its position with regard to Beckett's coverage was reasonable as a matter of law because: (1) Beckett refused to use any portion of the CNA settlement to cover the asbestos claims; (2) Ohio and out-of-state case law supported FFIC's position regarding Beckett's coverage; and (3) FFIC was entitled to review its rights after the settlement. ECF Doc. 29 at 15; ECF Doc. 36 at 17. FFIC also contends that Beckett has not produced any evidence that it was damaged as a result of FFIC's "delay in issuing a payment." ECF Doc. 36 at 17.[13]

Beckett responds that FFIC is not entitled to summary judgment on this issue because the evidence in the record shows that FFIC unilaterally stopped paying for *any* defense costs for the Asbestos claims. ECF Doc. 34 at 19; ECF Doc. 40 at 17. Further, Beckett asserts that FFIC's

---

[12] As with FFIC's contribution argument, FFIC's motion to certify a question to the Ohio Supreme Court or Ohio Court of Appeals does not include any question regarding Beckett's bad faith claim. *See generally* ECF Doc. 41; ECF Doc. 44.

[13] Noticeably missing from the Bad Faith sections of FFIC's summary judgment briefs is any assertion that FFIC could have reasonably based its decision to stop or delay paying Beckett's claims on its belief that the claims were barred under the pollution exclusion. *See* ECF Doc. 29 at 15-18; ECF Doc. 36 at 17-18. Instead, FFIC only asserts that its belief that the CNA settlement had some kind of impact on its duty to pay was the "reasonable justification" that supported its decision to stop or "delay" payments. ECF Doc. 29 at 15-18; ECF Doc. 36 at 17-18. Thus, the court declines to address whether FFIC's belief that the pollution exclusion barred coverage provided a reasonable justification for stopping or "delaying" payments. *See Dahlen v. Mich. Licensed Bev. Ass'n*, 132 F. Supp. 2d 574, 588 n.11 (E.D. Mich., 2001) (declining to address a claim not raised in a summary judgment motion but addressed only in passing in a reply brief).

decision not to pay damaged Beckett, because it was forced to pay out-of-pocket litigation and settlement costs that FFIC has not reimbursed.  ECF Doc. 40 at 17.

"Under Ohio law, 'an insurer has a duty to act in good faith in the handling and payment of the claims of its insured.'"  *Berkshire Life Ins. Co. of Am. v. Dorsky*, 178 F. Supp. 3d 625, 634 (N.D. Ohio 2016) (quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272 (1983)).  Mere refusal to pay based on an ultimately incorrect conclusion that a claim is not covered is insufficient to show a breach of that duty.  *Id.*  Instead, the insurance carrier breaches this duty only when "'the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial.'"  *Id.* (quoting *Thomas v. Allstate Ins. Co.*, 974 F2d. 706, 711 (6th Cir. 1992)).  "There may be a reasonable justification for the denial when 'the claim was fairly debatable and the refusal is premised on either the status of the law at the time of the denial or the facts that gave rise to the claim.'"  *Id.* (quoting *Barbour v. Household Life Ins. Co.*, No. 1:11-cv-110, 2012 U.S. Dist. LEXIS 46004 (N.D. Ohio, Apr. 2, 2012)).

FFIC has not carried its burden to show that it is entitled to judgment as a matter of law on Beckett's bad faith claim because the evidence in the record does not support FFIC's claim that the CNA settlement was a reasonable justification for stopping or "delaying" payment on Beckett's claims.  *Celotex Corp.*, 477 U.S. at 324.  Even if FFIC had only refused to pick up the portion of payments that CNA had made before the settlement, Ohio's rule imposing joint and several liability on primary insurers and requiring them to seek reallocation on the back end would preclude the conclusion that FFIC's decision to refuse payment was "reasonably justified."  *Cf. Goodyear Tire & Rubber Co.*, 95 Ohio St. 3d at 515-17; *Penn. Gen. Ins. Co.*, 126 Ohio St. 3d at 102.  But the evidence in the record does not show that FFIC's decision was so

limited, or even that FFIC merely "delayed" its payments.[14]  Instead, the only evidence in the record indicates that FFIC: (1) stopped making *any* payment toward Beckett's defense and settlement of the asbestos claims between the CNA settlement and the filing of this lawsuit; and (2) has not reimbursed Beckett for its out-of-pocket defense and settlement expenditures during that time.  ECF Doc. 34-1 at 5-6 (¶¶26-27).  Moreover, FFIC did not advise Beckett that it would cease payments beforehand.  ECF Doc. 34-1 at 5 (¶26).  Thus, the evidence Beckett has relied upon in opposing FFIC's motion for summary judgment presents sufficient disagreement regarding whether the CNA settlement created a reasonable justification for FFIC to refuse coverage.  *Anderson*, 477 U.S. at 251-52.

Because FFIC has not carried its burden to show that there is no genuine issue of material fact as to whether the CNA settlement provided reasonable justification for refusing to cover *any* of Beckett's defense and settlement costs between the date of the CNA settlement and the time this lawsuit was filed, FFIC's motion for summary judgment on Beckett's bad faith claim must be DENIED.  Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d at 258.

## IV.    Conclusion

FFIC has not shown that certification of either question presented in its motion to certify is necessary because existing case law is sufficient for this court to discern a reasonably clear and principled answer to: (1) whether the pollution exclusion provision in the FFIC policy precludes coverage for the underlying asbestos claims; and (2) whether FFIC can show that it is entitled to settlement credits, if available under Ohio law.  Thus, the court declines to exercise its discretion

---

[14] FFIC, in fact, has not pointed to *any* evidence that it merely "delayed" payments, as it has not shown that it reimbursed Beckett for any out-of-pocket expenditures during the time FFIC was "reviewing its rights."  *See generally* ECF Doc. 29 at 15-18; ECF Doc. 36 at 17-18.  And this court need not accept FFIC's unsupported statements as true.  *Alexander*, 576 F.3d at 560.

to certify questions to the Ohio Supreme Court, and FFIC's motion to certify questions to the Ohio Court of Appeals (ECF Doc. 41) is hereby DENIED.

Further, FFIC has not shown that it is entitled to judgment as a matter of law because it has failed to show that: (1) there is no genuine issue of material fact as to whether the pollution exclusion precludes coverage of the underlying asbestos claims; (2) it is entitled to settlement credits based on the CNA settlement; (3) it is entitled as a matter of law to contribution from Beckett for the periods during which the CNA-affiliated policies were in effect; and (4) there is no genuine issue of material fact as to whether the CNA settlement provided reasonable justification for refusing to cover *any* of Beckett's defense and settlement costs between the date of the settlement and the time this lawsuit was filed. Accordingly, FFIC's motion for summary judgment (ECF Doc. 29) is hereby DENIED.

**IT IS SO ORDERED.**

Dated: April 24, 2020

Thomas M. Parker
United States Magistrate Judge